March 6, }
  1911. }

## OPINION OF THE JUSTICES.

Under the constitution, the legislature may provide for the taxation of money on deposit and at interest; but it cannot impose a less burden upon such classes of property in proportion to their value than is placed upon other property, either by diminishing the rate at which they are taxed, or by requiring them to be rated for assessment at a smaller percentage of their true value.

On February 13, 1911, the speaker of the house of representatives requested the opinions of the justices of the supreme court in accordance with the following resolution, which was adopted by the house of representatives on February 7:

"Whereas, it appears to the house of representatives that a tax at a uniform, specific rate, lower than that assessed upon property in general, on stock in public funds, stock in corporations, and money on hand or at interest, in view of the uses to which the various classes of property are put, the income derived from them, and the benefit which they receive from governmental protection, will more nearly than existing methods of taxation result in each citizen contributing his share of the expense of such protection, and will also have the effect of producing, in fact, a larger contribution to the public revenues from property of the above named classes; and,

"Whereas, the house of representatives has under consideration the passage of a bill which shall provide for the levy by cities and

towns throughout the state of a tax upon certain classes of intangible property in the following terms, viz.:

" 'Personal property of the classes hereinafter enumerated is hereby exempt from all taxation other than that imposed by this act, and shall hereafter be subject to an annual tax of one half of one per cent on each dollar of the fair cash value thereof, viz.:

" '(1) Stock in public funds, including all United States, state, county, city, or town stock or bonds, and all other interest-bearing bonds not exempt from taxation by the laws of the United States, or [not] specifically exempt by the laws of this state.

" '(2) Stock in corporations in the state, except where the property represented by the stock is taxable directly to the corporations.

" '(3) Stock in corporations located out of the state, owned by persons living in the state, except where either the stock or the property represented by it is taxed in the towns or states where the corporations are located.

" '(4) Money on hand or at interest more than the owner pays interest for, including money deposited in any bank other than a savings bank within this state, or loaned on any mortgage, pledge, obligation, note, or other security, whether on interest, or interest be paid or received in advance.'

"Resolved, that the speaker of this house be directed to obtain the opinion of the supreme court as soon as possible as to whether, if the act were passed, the foregoing provisions would violate any portion of the constitution of the state of New Hampshire."

*Robert W. Upton* submitted a brief in support of the proposed law.

*To the House of Representatives:*

Our opinions are asked as to the constitutional validity of certain proposed legislation as to taxation. The act set forth in the resolution of inquiry fixes, in lieu of all other taxes, a tax at a uniform specific rate, lower in proportion to its value than that upon property in general, upon certain subjects enumerated in four paragraphs. As under modern business conditions actual money on hand must be practically negligible as a subject of taxation, the different subjects enumerated are all included in the terms money on deposit or at interest, and the question relates to the constitutional validity of a tax of this character upon credits.

The legal and economic errors possibly involved in any tax upon

credits are discussed at length in the report of the tax commission of 1908. "Whether the public expense is more justly and wisely divided by an inevitably unsuccessful effort to tax all property, or by the taxation of some class or classes of property that can be easily, equally, and certainly taxed, and the tax of which is equitably collected for the public from all classes of people by the higher government, is not a judicial question. If there is a class of property, the tax of which, by the natural law of tax distribution and equalization, would be eventually paid in just proportion by the whole community, the common burden may be wholly put upon that class. The non-assessment of other classes of property would not be an exemption of any class of people." *Morrison* v. *Manchester*, 58 N. H. 538, 555. As to the wisdom of the proposed legislation, our opinions are not, and could not be, required.

The questions of law involved upon which we may be constitutionally required to advise either branch of the legislature are (1) the legal validity of a tax on credits; (2) if such a tax may be imposed, may it be imposed upon the value of such property at a rate different from that upon property in general; and (3) may it be imposed at a fixed rate, regardless of the sum to be raised.

The objection to the validity of any tax upon credits is the claim that in effect it is double taxation of the same property. "It is a fundamental principle in taxation that the same property shall not be subject to a double tax, payable by the same party either directly or indirectly." *Nashua Savings Bank* v. *Nashua*, 46 N. H. 389, 398; *Cheshire County Tel. Co.* v. *State*, 63 N. H. 167; *Smith* v. *Burley*, 9 N. H. 423, 427. But if economically or legally the taxation of credits is double taxation and constitutionally unsound, such property rights were when the constitution was adopted, and have been ever since, treated as proper subjects of taxation. The result of this practical and continuous construction of the constitution is, that "in this state, the taxability of money at interest is not an open judicial question. Whether the assessment of money at interest is a process of ascertaining the lender's or the borrower's just share of the public expense, or an exceptional, double, or otherwise wrongful taxation of the borrower, . . . permitted, not required, by an erroneous constitutional construction established by legislative usage and judicial recognition, we need not inquire. If the assessment of a creditor for his interest-bearing loan of money is, in effect, either a double taxation of his debtor, or a taxation of the debtor for property which, by conveyance or destruction, has ceased to be

his, . . . such taxation is sustained by the authority of precedent, . . . too firmly established to be overthrown by any other authority than that of making laws." *Morrison* v. *Manchester*, 58 N. H. 538, 551, 552. The taxation of money at interest is constitutional. *Glidden* v. *Newport*, 74 N. H. 207.

Considering credits as a class of property subject to taxation, have the legislature power to impose a less burden upon them in proportion to their value than is placed upon other property, either by diminishing the rate at which they are taxed, or requiring them to be rated for assessment at a less percentage of their true value?

"The supreme legislative power, vested in the senate and house of representatives by the second article of the constitution, includes the power of taxation, which is the power of causing a constitutional division to be made among the members of the community, of the public expense, of which each one is, by the twelfth article of the bill of rights, bound to contribute his share. Each one is bound to contribute his share of the expense incurred by all in protecting the life, liberty, and property of each, and promoting the common welfare. What each is bound to contribute being a debt of constitutional origin and obligation, no part of the share of one can be constitutionally exacted of another." *Morrison* v. *Manchester*, 58 N. H. 538, 549. "This power, inherent in the people, was by them delegated to the general court, subject to the condition that all taxes imposed should be proportional and reasonable upon all the inhabitants of and residents within the state, and upon all the estates within the same. While they granted the power in general terms, they qualified the manner of its execution, and determined the subjects upon which it should operate. It was confined to persons and estates." *State* v. *Express Co.*, 60 N. H. 219, 236. "To establish the rules by which each individual's just and equal proportion of a tax shall be determined is a task of much difficulty, and a very considerable latitude of discretion must be left to the legislature on the subject." *Opinion of the Court*, 4 N. H. 565, 570.

Since 1833, the legislative and judicial construction of the constitution has been that an equal division requires a proportional valuation of all property taxed and the assessment of all at the same rate. The act of January 4, 1833 (Laws 1832, c. 108), required the appraisal of all taxable property, or ratable estate (the term used in the act), at its full and true value in money, and that the same be estimated for assessment at one half of one per cent, precisely as the statute now requires. P. S., c. 58, s. 1; *Ib.*, c. 59, s. 1. Chap-

ter 58 of the Public Statutes provides for an invoice of all taxable property and requires (s. 1) the selectmen to appraise all taxable property therein "at its full and true value in money." Chapter 59, relating to the assessment of taxes, provides (s. 1) that "all taxes . . . shall be assessed upon the invoice, . . . estimating each poll at fifty cents, and taxable property at the rate of fifty cents on each hundred dollars of its appraised value." Whether this latter statute was intended to avoid difficulties in the arithmetical computation of individual taxes, or is merely a survival of early provincial methods of assessment, it is probably now generally disregarded in assessing taxes; and its only office is to effect the distribution of the tax between polls and estates. Modern practice generally, it is believed, treats polls as appraised at $100 each and assesses the tax directly upon the appraised value of the property, producing the same result as if the form of the statute were followed. *Amoskeag Mfg. Co. v. Manchester*, 70 N. H. 336, 346, 347. This scheme of assessment is, however, important to a correct understanding of the taxing statutes enacted prior to 1833, hereinafter considered.

The change of 1833 was made after the response of the court, on June 6, 1828 (House Jour., 1828, *p.* 26), to a resolution of the house of representatives passed June 25, 1827 (House Jour., 1827, *p.* 193), inquiring as to the power of the legislature in taxation, in which it was said of the equality prescribed by the constitution, "the equality here intended is that the same tax shall be laid upon the same amount of property in every part of the state, so that each man's taxable property shall bear its due portion of the tax according to its value"; and of the share which each was by the twelfth article declared bound to contribute, "it is very manifest that 'his share' here means his proportional part of the expense, according to the amount of his taxable estate." *Opinion of the Court*, 4 N. H. 565, 568. The precise part this enunciation of constitutional principles had in producing the legislation of 1833 it is probably impossible to ascertain at this day; but it is not unreasonable to regard it as one cause of the change. The views announced in 1828, and apparently followed by the legislature in 1833, have been frequently reaffirmed. Under the constitution, it has been said "there is no warrant for the imposition of any other tax than one assessed upon a proportional and equal valuation of all the different kinds of property on which it is to be levied." *State v. Express Co.*, 60 N. H. 219, 246. In June, 1900, in *Amoskeag Mfg. Co. v. Manchester*,

70 N. H. 336, 344, it was said: "By an unbroken line of decisions
in this state during the last seventy-three years, from the *Opinion
of the Justices* in 1827 [1828] (4 N. H. 565) to the decision in this
case at the last term, it has been conclusively settled that the con-
stitutional rule of equality in taxation requires that throughout the
same taxing district the same tax shall be laid upon the same amount
of property, 'so that each man's taxable property shall bear its
due portion of the tax according to its value.' The share which
every person is bound to contribute for the protection in the enjoy-
ment of his life, liberty, and property, to which he is entitled (Bill
of Rights, *art.* 12), is his proportional part of the expense of such
protection according to the amount of his taxable estate." See
*Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 200, 204, and authorities
cited. The proposition was then regarded as so thoroughly estab-
blished and understood that it was conceded by the able counsel
engaged for the plaintiffs "that the constitutional rule of equality
requires a proportional and equal valuation of the different kinds
of taxable property." *Ib.* 204. The constitutional method of mak-
ing an equal division of public expense, established by legislative
and judicial precedents unvarying for over eighty years, is not to
be lightly set aside. By universal acquiescence and approval, the
meaning of the constitution is established. *State* v. *Griffin*, 69 N. H.
1, 33; *Boston etc. R. R.* v. *State*, 62 N. H. 648, 649; *State* v. *Hayes*,
61 N. H. 264, 322; *Morrison* v. *Manchester*, 58 N. H. 538, 551, 552.
Taxing property at a lower rate as proposed upon its value pro-
duces the same result as rating it for taxation at a lower percentage
of that value. The universal understanding has been that all prop-
erty must be assessed upon the same percentage of its value.

So far as we are aware, the only argument that has been advanced
against the view held from 1833 to the present time is based upon
the claim that from the adoption of the constitution until 1833
all property taxed was not annually appraised, but much of the
property taxed was rated by legislative act. In the period from
the establishment of the colony to the Revolution, there was con-
structed "a complete system of taxation, built upon the theory of
taxing every person according to his income. . . . From 1775
to 1789, the system inherited from the colonial government was
maintained intact. The avowed object was to tax 'every person in
proportion to his income,' and the bases were polls, ratable estate,
and faculty. The first significant change occurred in 1789, when the
income theory . . . was permanently abandoned and the taxa-

tion of 'every person in proportion to his estate' was substituted. As a natural consequence, the taxation of a person's 'faculty' was no longer attempted." Robinson Hist. N. H. Taxation 85, 86. See the acts of April 12, 1770, January 2, 1772, July 2, 1776, June 12, 1784, February 7, 1789, February 8, 1791, February 22, 1794, December 26, 1798, December 19, 1803, December 16, 1812, and July 3, 1830, reprinted in the appendix to Report of Tax Commission, 1908, *pp.* 214–270.

The preamble to the act of 1770 is: "Whereas there is no rule established by law for making rates and taxes, so that every person may be compelled to pay in proportion to his income, but the same hath been left altogether to the arbitrary determination of selectmen and assessors in the several towns and parishes within this province, which causeth much uneasiness and many complaints. For preventing whereof, and for the more equal and just distribution of the burden of taxes on the polls and estates,  .   .   . *Be it enacted,*" etc. The difficulty of uniform appraisal by local boards seems to be not of recent origin. The object of the legislation was apparently to secure a more equitable appraisal.

After the change in the theory and practice of taxation in 1789, more attention was given to the valuation of property included in the inventory and to the taxation of new forms of personal and real property. Less attention was paid to the poll tax, and new property was from time to time added to the list. "Changes in the valuation of real estate were especially marked. In 1803, the valuation of land was advanced, especially when compared with live stock, one of the chief items of the inventory. Again in 1830, a general reduction of nearly twenty-five per cent was made in the valuation of all classes of property that were arbitrarily rated by legislative act. In a few cases, however, the valuation was increased. Such a general readjustment indicates clearly that values were undergoing radical changes, and that the old method of rating large classes of property by the legislature for a term of years had become, under the influence of a new industrial era, unsuited to the conditions. A fixed list was extremely convenient while values remained stable, and proved equitable and hence satisfactory in its workings. When values began to change rapidly and new forms of property were appearing, the market price was nearer the just price than any that could be fixed months in advance by the legislature. It is strictly in accordance with the working of natural laws that the rating system was abandoned in 1833, and

a less arbitrary method substituted providing that all taxable property should be appraised at its true value in money by the local assessors." Robinson Hist. N. H. Taxation 87, 88. In short, the attempt to determine value, a question of fact, by a rule, like a question of law, failed as it logically must.

Article 5 of the constitution gave the legislature power to "impose and levy proportional and reasonable assessments." Article 6, while prescribing that the public charges "shall be assessed on polls and estates in the manner that has heretofore been practiced," provided that "in order that such assessments may be made with equality, there shall be a valuation of the estates within the state taken anew once in every five years, at least, and as much oftener as the general court shall order." It was known how estates had been valued since 1770, and in ordering a new valuation every five years like legislative action was expected. Accordingly, the legislature acted in 1784 and in 1789 in passing the assessment acts referred to, and at intervals thereafter until 1833, when the annual valuation was provided for. In these acts much property is specified and rated at a fixed sum, but they indicate very clearly a purpose to make the rating of property approximately proportional to its value. While improved lands are rated at a fixed sum by the acre, the acreage is to be estimated by the produce of the land or its capacity to support stock; while property whose rating is left to the estimation of the assessors is rated at a percentage either of its yearly income or of its value.

The change from taxation in proportion to income to taxation in proportion to property had been gradual; and while the constitution went into effect June 2, 1784, the full effect of the constitutional provisions was probably not at first appreciated, for the assessment act of June 12, 1784, provided for the rating of a person's "faculty," as had the prior acts. The different acts show an increasing amount of property rated according to its value determined by estimation; and the next act (February 7, 1789) omits "faculty" as a basis of taxation, and it does not again appear. The acts themselves indicate that they were understood and intended to be appraisals or valuations of taxable property made in a manner which the experience of the time found most equitable and just. In the act of 1770, stock in trade and money at interest were rated at one per cent; two years later (1772) at one half of one per cent, precisely as the statute rates it today. All property the valuation of which was left to the assessors, with an occasional exception, was rated the same.

The presumption is, and there is no evidence to the contrary, that in specifically rating other property the same percentage of its true value was intended to be reached. Instead of showing that the constitution was then understood to authorize an arbitrary rating regardless of value, the acts taken together show an adherence to and an increased understanding of the meaning of the constitution as it has been since understood, until in 1833, possibly as a result of judicial expression, the true rule was reached, which has ever since been followed. See *Doe*, C. J., in *State* v. *Express Co.*, 60 N. H. 219, 246, 247. It seems clear that these assessment acts were not intended to be an arbitrary imposition of specific taxes upon the objects named, but were, in the language of the constitution, valuations of the estates—appraisals of the property to be taxed at its fair value, so that proportional taxes might be laid. They furnish no foundation for constitutional construction in opposition to the practice and rule since 1833.

From 1770 to 1794, money at interest was rated at the same per cent as other property valued, from 1772 to 1789 at one half of one per cent, from 1789 to 1833 at three fourths of one per cent, while some of the other property was rated at one half of one per cent. Whether it was considered that money was rated higher than other property specifically rated, or some other (like stock in trade at one half of one per cent) was rated lower as an encouragement of trade, cannot be known; but the error, if there was one from 1794 to 1833, of rating money at interest higher than other property, corrected in 1833, is not sufficient evidence of correct constitutional construction to authorize its rating now seventy-five per cent less than other property. The proposal of the bill to change this rule antedating the constitution and to tax it at a rate upon its true value less than one fourth that upon other property, shown by the reports of the board of equalization to average in the neighborhood of two per cent throughout the state, or to rate it for assessment at one eighth of one per cent while other classes of property are rated at one half of one per cent, involves a reversal of legislative and judicial precedents, maintained unbroken for years, that neither the legislature nor the court have the power to make.

If it is established that the method proposed "will more nearly than existing methods of taxation result in each citizen contributing his share of the expense" of government, whether the change should be made is not a legislative or a judicial, but is a constitutional question, and relief must be sought in the convention of the people.

*Thompson* v. *Kidder*, 74 N. H. 89, 92, 93.   A further constitutional objection to the bill is the fixed rate not dependent upon the sum to be raised.   But as this objection could easily be obviated by authorizing the appraisal or rating of the property in question at a lower rate in proportion to its value than other property, if that could be done, and the object of the legislature substantially accomplished, it seemed necessary to consider first the question that has been discussed.   The result renders discussion of the other unnecessary.   We are constrained to answer that in our opinion legislation of the character proposed is for the reasons given beyond the power of the legislature.

FRANK N. PARSONS.
REUBEN E. WALKER.
GEORGE H. BINGHAM.
JOHN E. YOUNG.
ROBERT J. PEASLEE.

March 6, 1911.