1998-NMCA-152

966 P.2d 168

**Fred C. HANNAHS and Judy M. Hannahs, Protestants– Appellants,**

v.

**David Kirk ANDERSON, Assessor of Bernalillo County, New Mexico, Respondent–Appellee.**

Nos. 17,898, 18,908.

Court of Appeals of New Mexico.

July 14, 1998.

Certiorari Denied, No. 25,358, Oct. 13, 1998.

Fred C. Hannahs, Albuquerque, Pro Se Appellant and for Judy M. Hannahs.

Barbara Ball, Ass't County Attorney, J. Edward Hollington, Ass't County Attorney, Bernalillo County, Albuquerque, for Appellee.

## OPINION

PICKARD, J.

{1}   We consolidate two separate appeals brought by Fred and Judy Hannahs (Tax-

payers) from decisions of the Bernalillo County Valuation Protest Board (Board). Taxpayers challenge the assessed value placed upon their lot, minus improvements, for the 1996 and 1997 tax years. Taxpayers also claim that the County Tax Assessor's (Assessor) denial of their discovery request for information on lot sizes and valuations of other lots within their subdivision prejudiced the presentation of their case and required the Board to sanction Assessor. An appeal raising similar issues arising out of the 1995 tax year was affirmed by memorandum opinion in *Hannahs v. Anderson*, Ct.App. No. 17,563 (filed Nov. 14, 1996). As we did in the earlier case, we affirm.

## BACKGROUND

{2} Taxpayers own property in Bernalillo County. Taxpayers' real property, consisting of 6,300 square feet of land, was valued at $28,350 or $4.50 per square foot for the 1996 and 1997 tax years. The improvements on Taxpayers' property were valued at $70,818 for a total assessed value of $99,168. Taxpayers filed protests in 1996 and again in 1997 challenging the Assessor's valuation of their lot, minus improvements. The petitions in both of those protests raised similar issues.

{3} In 1996 and in 1997, Taxpayers submitted discovery requests which asked to review Assessor's records on several lots located in Taxpayers' subdivision. Taxpayers wanted access to Assessor's computations, valuations, lot sizes, and amount of taxes assessed on the other lots so that they could compare them with Taxpayers' lot size and valuation. Assessor denied the discovery request because the information Taxpayers sought was contained on record cards which are not generally public information. The property record cards, Assessor explained, are the internal records regarding lot size, improvements, and other property information, some of which is confidential.

{4} At hearings before the Board, Taxpayers argued that the information they sought to review were public records and that the computations and data the Assessor relied on in valuing those properties within their subdivision were not otherwise available. However, Taxpayers admitted that they were able to obtain assessments of the subdivision from a title company and had also purchased a copy of the subdivision plat. Using the dimensions shown on the plat, Taxpayers were able to calculate the lot sizes in the subdivision.

{5} Taxpayers challenged the Assessor's valuation of their lot. Testimony was presented that Assessor computed the land value of each lot in the subdivision on a $4.50 per square foot basis. Taxpayers' challenge was based on their argument that the $4.50 per square foot value was not applied uniformly to other lots in the subdivision. Taxpayers demonstrated, using their own calculations of lot size, that values of other lots varied from $3.38 to 6.03 per square foot. Thus, some lots were assessed at more or less than the $4.50 per square foot value assigned by Assessor.

{6} Taxpayers then argued that the assessed value of their lot should be determined by taking its 1993 assessed value and adding to it the appreciation in value. Taxpayers presented an affidavit from a realtor stating that the realtor had conducted a market value analysis of the sales of properties located within Taxpayers' subdivision. The affidavit explained that the average market value of parcels in that subdivision had appreciated 20 to 21 percent during a period prior to mid–1994 and had since remained stable. Taxpayers added the 20% appreciation to the 1993 assessment which resulted in a total of $20,790 for their land minus improvements—approximately $7,500 less than the challenged assessment.

{7} Assessor argued in both protest hearings that Taxpayers were using an appraisal technique that was not generally accepted and that the market value analysis was the appropriate valuation method. Assessor also explained that segregating the lot value from the improvement value resulted in a flawed valuation. The total value of the property must be examined, Assessor contended. By examining the total assessed value of Taxpayers' lot through the use of comparable sales, Assessor revealed that Taxpayers' property was in fact under-assessed.

**4**

{8} The Board denied Taxpayers' protest in both hearings and ordered that no change be made in the 1996 and 1997 valuation records. Additionally, during the 1996 hearing the Board found that the discrepancies in land valuations among the properties in the subdivision were irrelevant to whether Taxpayers' property had been properly assessed. In the 1997 hearing, the Board sanctioned Assessor for refusing discovery by prohibiting Assessor from objecting to the introduction of Taxpayers' secondary evidence.

**DISCUSSION**

A. Standard of Review

{9} The Assessor's decision will be set aside if it is: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record taken as a whole; or (3) otherwise not in accordance with law." NMSA 1978, § 7-38-28(B) (1990).

{10} We do not reweigh the evidence; nor do we substitute our judgment for that of the Board if its findings are supported by substantial evidence on the record as a whole. *See Gallegos v. New Mexico State Corrections Dep't,* 115 N.M. 797, 800, 858 P.2d 1276, 1279 (Ct.App.1992). Whole record review requires us to consider all evidence in support of one party's contentions and also to consider evidence which is contrary to the Board's findings. *Cibola Energy Corp. v. Roselli,* 105 N.M. 774, 776, 737 P.2d 555, 557 (Ct.App.1987). Then, we must "decide whether, *on balance,* the agency's decision was supported by substantial evidence." *Id.*

B. Discovery

{11} Taxpayers argue that the lot-size and valuation information they sought to inspect are public records and that Assessor wrongfully denied their discovery requests. Taxpayers claim that they needed the requested material in order to have a meaningful opportunity to prepare and present their case by showing the Board that the information Assessor relied on and applied in valuing their lot was flawed. Taxpayers contend they were prejudiced not only because Assessor denied discovery, but also because the

Board failed to offset the impact of such denial by refusing to grant them the relief they were entitled to under PTC Regulation 38-27:3. PTC Regulation 38-27:3 provides:

PROTEST HEARINGS–DISCOVERY–CONSEQUENCES OF FAILURE TO ALLOW DISCOVERY

The protestant has the right to discover relevant and material evidence in the possession of the assessor prior to the protest hearing. If the assessor refuses to permit discovery, the County Valuation Protests Board, for the purpose of resolving issues and disposing of the proceeding without undue delay despite the refusal, may take such action in regard to the refusal as is just, including but not limited to, the following:

1) infer that the admission, testimony, documents or other evidence sought by discovery would have been adverse to the position of the county assessor;

2) rule that, for the purposes of the proceeding, the matter or matters concerning which the evidence was sought be taken as established against the position of the county assessor;

3) rule that the county assessor may not introduce into evidence or otherwise rely, in support of any claim ·or defense, upon testimony by such party, officer or agent or upon the documents or other evidence discovery of which has been denied; or

4) rule that the county assessor may not be heard to object to introduction and use of secondary evidence to show what the withheld admission, testimony, documents or other evidence would have shown.

Any such action may be taken by written or oral order issued in the course of the proceeding or by inclusion in the decision of the Board. It is the duty of the parties to seek and of the Board to grant such of the foregoing means of relief or other appropriate relief.

{12} The Inspection of Public Records Act (the Act), NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 1993), provides that "[e]very person has a right to inspect any public records of this state" and lists the few exceptions to this rule. *See* § 14-2-1. The Act also sets forth the procedure for

requesting information and the procedure for enforcing denied requests. *See* §§ 14–2–8 and –12.

{13} The Property Tax Code, NMSA 1978, § 7–38–19(D) (1991) states that "[e]xcept as provided otherwise in Subsection E of this section, valuation records are public records." Subsection E provides that:

> Valuation records that contain information regarding the income, expenses other than depreciation, profits or losses associated with a specific property or a property owner or that contain diagrams or other depictions of the interior arrangement of buildings, alarm systems or electrical or plumbing systems are not public records and may be released only in accordance with Paragraphs (2) through (7) of Subsection A of Section 7–38–4 NMSA 1978.

NMSA 1978, § 7–38–4(A) (1991) states that it is unlawful to provide information to any person other than designated state employees "about a specific property . . . gained as a result of a report or information furnished the department or a county assessor by a taxpayer or as a result of an examination of property or records of a taxpayer." However, information limited to that contained in valuation records that are public records may be released. *See* § 7–38–4(A)(1).

{14} PTC Regulation 38–27:3 allows persons protesting their tax assessment the "right to discover relevant and material evidence in the possession of the assessor prior to the protest hearing." Taxpayers' requests to review information on other properties in their subdivision were denied by Assessor. During the protest hearings, Taxpayers argued that Assessor wrongfully denied them access to public records which they have a statutory right to inspect. Taxpayers asked the Board to sanction Assessor pursuant to PTC Regulation 38–27:3 which mandates that "[i]t is the duty of the parties to seek and of the Board to grant" appropriate relief for failure to permit discovery.

{15} We are not persuaded by Taxpayers' arguments. First, as to the 1996 decision, we hold that there was no violation of PTC Regulation 38–27:3, and thus the Board was not required to sanction Assessor. The Regulation states that relevant material is discoverable. *See* PTC Regulation 38–27:3. The Board, however, expressly found that the discrepancies in valuation among the other properties in the subdivision were not relevant to whether Taxpayers' property was properly assessed. Thus, although Taxpayers sought information on other lots to demonstrate the discrepancies in valuation, to the extent the Board found that this information was irrelevant to whether Taxpayers' property was correctly assessed and to the extent we uphold that finding later in this opinion, there was no error in refusing to sanction Assessor. Therefore, if Taxpayers believed that Assessor wrongfully denied them access to public records, Taxpayers should have pursued the remedies provided in Section 14–2–12. As to the 1997 hearing, the Board granted Taxpayers' request for relief and held that Assessor should be estopped from challenging the introduction of Taxpayers' secondary evidence. Thus, the Board granted what it considered to be an appropriate sanction under the circumstances.

{16} The Board's 1996 and 1997 decisions may appear inconsistent because in one the Board found that the information Taxpayers requested was irrelevant and yet in the other the Board allowed Taxpayers to introduce their secondary evidence without objection. However, this apparent inconsistency may be explained. In 1997, Taxpayers specifically argued that the disparities in lot size and valuations were unconstitutional. In 1996, Taxpayers demonstrated that disparities existed, but they did not argue that the lack of uniformity was unconstitutional. Thus, because Taxpayers did not make the constitutional argument, the Board could logically conclude that the information Taxpayers presented in 1996 was irrelevant.

{17} Moreover, it does not appear that Taxpayers were prejudiced by Assessor's refusal to grant them access to the information they requested. Taxpayers acknowledged during both protest hearings that they were able to obtain lot-size data from other sources and they had an expert witness testify as to the calculations of actual lot sizes. Additionally, to the extent Taxpayers contend that they were prejudiced be-

cause they could not present direct evidence of the Assessor's flawed valuation method, nonetheless, Taxpayers were able to use their "secondary" evidence to argue their case—that Assessor's valuations were not uniform. Furthermore, the Board specifically considered this secondary evidence. In fact, in 1997 the Board held that Taxpayers' secondary evidence rebutted the presumption of correctness surrounding their property assessment. Thus, because Taxpayers were able to obtain the information from a different source and present that evidence to the Board for consideration, we hold that Taxpayers were not prejudiced by Assessor's refusal to comply with their discovery request.

{18} Before we conclude our discussion of Taxpayers' discovery challenge, we make a few observations. During both protest hearings, Assessor objected to Taxpayers' discovery challenge claiming that Taxpayers did not comply with the formal requirements of the Rules of Civil Procedure relating to discovery. Specifically, Assessor argued that Taxpayers were required to file a motion to compel discovery. The Board agreed that the formal rules of discovery applied, that Taxpayers were required to put the Board and Assessor on notice that a discovery issue would be raised by filing a motion to compel, and that the Board could resolve the discovery issue in a separate proceeding. Taxpayers countered that the Board does not have the authority to order Assessor to comply with discovery requests but can only rule on the consequences of the failure to comply. We do not decide whether the formal procedures for which Assessor argued are required or whether the Board has the authority to grant motions to compel discovery. We do note, however, that such formalistic requirements may be impractical and contrary to PTC Regulation 38–27:3 which allows the Board to address discovery issues during protest hearings so it can resolve and dispose of the proceeding "without undue delay." To the extent the Board found, and Assessor argued, that motion hearings were required, this may cause delay and thus be contrary to PTC Regulation 38–27:3.

{19} Furthermore, we note the inconsistency in Assessor's position. During the 1997 protest hearing, Assessor argued that the Board has the authority to order the Assessor's office to comply with discovery requests prior to a protest hearing. The reason Assessor was so certain that the Board had the authority to order discovery is because the Board has done so in the past and Assessor, challenging the Board's authority to do so, has appealed the issue to the district court. Insofar as Assessor is asking for a formal procedure, which it then turns around and challenges, this argument is not persuasive.

{20} Furthermore, although the Board did not make a finding on this matter, we note that Assessor claims that the reason it did not comply with discovery was because the information that Taxpayers sought was on record cards which also contained confidential information about the properties. The Board then assumed that Assessor's refusal to comply with discovery was in good faith. Nonetheless, PTC Regulation 38–27:3 does not require, contrary to the Board's conclusion, that Assessor improperly or wrongfully refuse to provide discovery. In fact, PTC Regulation 38–27:3 contains no language referring to the Assessor's intent in refusing to comply with discovery. PTC Regulation 38–27:3 states that the Board has discretion to impose an "appropriate" sanction for failure to provide requested materials. Thus, it appears that PTC Regulation 38–27:3 would allow the Board to sanction even where the refusal was made in good faith.

{21} We acknowledge the Board's concern that PTC Regulation 38–27:3 places the Assessor in a tenuous position because if Assessor releases confidential information it will violate Section 7–38–4(B) which provides for criminal penalties. *See id.* On the other hand, if Assessor refuses to comply with discovery, Assessor could be sanctioned by the Board. Nonetheless, the Board may properly consider the Assessor's reason for its refusal to provide discovery in determining what relief to provide to the protestant.

## C. Valuation

{22} Assessor's valuation of property is presumed correct. *See* NMSA 1978, § 7–38–6 (1981). Taxpayers challenging their assessments have the burden of rebutting this presumption by "showing that the assessor did not follow the statutory provisions of the Act or by presenting evidence tending to dispute the factual correctness of the valuation." *First Nat'l Bank v. Bernalillo County Valuation Protest Bd.*, 90 N.M. 110, 114, 560 P.2d 174, 178 (Ct.App.1977); *see also La Jara Land Developers, Inc. v. Bernalillo County Assessor*, 97 N.M. 318, 320, 639 P.2d 605, 607 (Ct.App.1982). Once a taxpayer overcomes the presumption of correctness, the burden then shifts to the assessor to show that the valuation method used to assess the property was based upon generally accepted appraisal techniques. *See First Nat'l Bank*, 90 N.M. at 114, 560 P.2d at 178. Once the assessor does so, the Board then decides the merits of the protest. *See id.*

{23} Assessor presented testimony from an appraiser who explained that the land value of each lot in Taxpayers' subdivision was calculated on a $4.50 per square foot basis. Taxpayers challenged Assessor's valuation claiming that contrary to the appraiser's testimony, no single square foot measure was used to value the lots in the subdivision. Taxpayers showed that dividing $4.50 into the assessed value of each lot did not yield the precise square footage of the lots. Instead, there were discrepancies with some lots assessed at $3.38 per square foot and others assessed as high as $6.03 per square foot. Taxpayers' lot, however, was correctly assessed at $4.50 per square foot.

{24} Based on this evidence, in the 1997 hearing the Board found that Taxpayers overcame the presumption of correctness by demonstrating that the $4.50 per square foot value was not uniformly applied to all lots in their subdivision. The burden then shifted to Assessor to show that the valuation method used to assess Taxpayers' property was based upon generally accepted appraisal techniques. Assessor met this burden.

{25} Assessor presented testimony that the preferred method of valuation was market value as determined by sales of comparable property. *See* NMSA 1978, § 7–36–15(B) (1995). This method, the appraiser explained, is a process of analyzing sales of similar recently sold property to derive an indication of the most probable sales price of the property being appraised. The appraiser testified that in valuing Taxpayers' property, the determination of value was based on evidence of other specifically identifiable and comparable market sales of properties in Taxpayers' subdivision. The appraiser discussed the sale of three properties located in Taxpayers' subdivision which were comparable to Taxpayers' property in age, condition, size, location, and construction.

{26} One property, consisting of 1,840 square feet of improvements was sold for $155,100 or $84.29 per square foot. The assessed value of this property in 1997 was $117,107 or $63.65 per square foot. A second property was sold in 1994 for $150,000 or $84.69 per square foot. The 1997 assessed value of the second property was $120,691 or $68.15 per square foot. A third property of 1,616 square feet of improvements was sold in 1996 for $152,500 or $94.37 per square foot. The assessed value of this third property was $101,723 or $62.95 per square foot. In contrast, the assessed value of Taxpayers' property—$99,168 and $56 per square foot—was lower than the assessed value of all the comparable properties. Therefore, the Board found that even if there was an error in valuing Taxpayers' lot, it was more than offset by the error in Taxpayers' favor which under-assessed the total value of their property. The Board rejected any attempt by Taxpayers to gain an even lower valuation by attacking the assessment attached to their land, without considering the total valuation of the property.

{27} On the other hand, Taxpayers vigorously object to the introduction of any evidence or argument which concerns the value of improvements. Taxpayers contend that their protest challenges only the portion of the assessment directed to the value of their land and therefore any consideration of the total value, which includes the value of the

improvements, is irrelevant. Assessor testified that although he is statutorily required to segregate the improvement value from the lot value, all generally accepted appraisal techniques do not separate the two values, but instead refer to the total value of the property. Thus, Assessor did not arrive at a value of the lot separate from the value of the improvements because that is not a generally accepted appraisal technique. (We note that we have been unable to find a general statute requiring the improvement value to be segregated from the lot value. The notice of value form does segregate land value from improvements value, and certain alternative forms of valuation require such segregation. *See, e.g.,* NMSA 1978, § 7–36–20(E) (1975). However, we are unsure of the precise statutory basis for Assessor's testimony.)

{28} Furthermore, Assessor explained that improvements are a substantial part of the value of a residential property and are relevant to determining valuation for tax purposes. Additionally, Taxpayers did not present any evidence which stated that segregating the value of the improvements from the value of the lot is a generally accepted appraisal technique.

{29} Nonetheless, Taxpayers argue for the application of a different valuation method which would add a twenty-percent appreciation value to the 1993 assessment of their property for a total of $20,790. This would result in Taxpayers' lot having an assessed value of $3.30 per square foot—the lowest per square foot assessment in the subdivision. Considering that the total value of Taxpayers' property is already under-assessed, to the extent Taxpayers are arguing for a further reduction in the assessed value of their property, their arguments are unconvincing.

{30} Additionally, Taxpayers' appraisal method is based upon the market analysis conducted by the realtor whose testimony Taxpayers presented in the form of an affidavit. The Board, although admitting the realtor's affidavit into evidence, assigned little weight to his conclusions. The Board noted that the realtor was not present for cross-examination and as such many questions surrounded his analysis. Among the Board's concerns were whether the sales that the realtor referred to in his affidavit were sales of vacant property or sales of improved parcels, whether the Taxpayers' property could be distinguished from the sales relied upon by the realtor, and whether the realtor was impartial or whether he had an interest in the outcome of the hearing.

{31} Furthermore, the affidavit did not state that adding the increase in appreciation to a previous assessment was a generally accepted appraisal technique. In fact, as noted before, Taxpayers presented no evidence that their appraisal method was generally acceptable. Taxpayers attempt to shift this burden by arguing that the Assessor did not present evidence that Taxpayers' technique was invalid. However, it is not Assessor's responsibility to establish the invalidity of Taxpayers' appraisal technique. If Taxpayers want the Board, or this Court, to accord substantial weight to their valuation method, it is their responsibility to present some testimony or evidence which sets forth that method as a generally accepted appraisal technique. *Cf. First Nat'l Bank,* 90 N.M. at 114, 560 P.2d at 178 (stating that to overcome presumption of correctness, taxpayer may "present evidence of value based on generally accepted appraisal techniques that tend to dispute the factual correctness of the method of valuation used by the board.") Therefore, we hold that there was substantial evidence to support the Board's findings and Taxpayers are not entitled to a change in the valuation of their property.

D. Uniformity Clause

{32} Article VIII, section 1 of the New Mexico Constitution provides that "taxes shall be equal and uniform upon subjects of taxation of the same class." The rule is that "[a] taxpayer must not be subjected to discrimination in the imposition of a property tax burden which results from systematic, arbitrary, or intentional revaluation of some property at a figure greatly in excess of the undervaluation of other like properties." *Ernest W. Hahn, Inc. v. County Assessor,* 92 N.M. 609, 611, 592 P.2d 965, 967 (1978). Nevertheless, "[u]niformity and equality do

not mean mathematical exactitude." *Id.* at 613, 592 P.2d at 969. Furthermore, as the Supreme Court acknowledged, "[i]t is, of course, too much to expect that there will be absolute uniformity at any time (appraisals involve the human equation and therefore are simply not 100% accurate)." *State ex rel. Castillo Corp. v. New Mexico State Tax Comm'n,* 79 N.M. 357, 362, 443 P.2d 850, 855 (1968). Taxpayers contend that the lack of uniformity in assessing the per square foot value of real property in their subdivision is a constitutional violation. However, we hold that Taxpayers have not presented sufficient information from which to find that the valuation assigned by Assessor amounted to an intentional and arbitrary discrimination in violation of the uniformity clause.

{33} To support a challenge to property tax assessments under the uniformity clause, Taxpayers were required to show that the "inequality is substantial and amounts to an intentional violation of 'the essential principle of practical uniformity.' " *Ernest W. Hahn, Inc.,* 92 N.M. at 613, 592 P.2d at 969 (quoting *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 447, 43 S.Ct. 190, 67 L.Ed. 340 (1923)). Furthermore, an error in judgment in estimating a property's market value is not sufficient to demonstrate unconstitutional discrimination. *Id.*

{34} Assessor explained that the $4.50 per square foot value was an estimate of the value of the lots, minus improvements, in the subdivision. This value was assigned because of the perceived requirement that Assessor provide a value for lots exclusive of the value of the improvements on the notice of value mailed to property owners. Therefore, although Taxpayers were able to present evidence that a disparity existed, they did not present any evidence that the disparity was substantial, intentional, or even related to the overall assessment of the property. In fact, Taxpayers' lot value, minus the improvement value, was correctly assessed. Moreover, the total value of Taxpayer's property was under-assessed. Thus, we find no constitutional violation.

## CONCLUSION

{35} The decisions of the Board are affirmed.

{36} **IT IS SO ORDERED.**

APODACA, and BUSTAMANTE, JJ., concur.