Rockingham
No. 2001-063

EVELYN SIRRELL & a.

v.

STATE OF NEW HAMPSHIRE & a.

May 3, 2001

*Flygare, Schwarz & Closson, P.L.L.C.*, of Exeter (*Thomas M. Closson* and *Daniel P. Schwarz* on the brief and orally), for the plaintiffs.

*Philip T. McLaughlin*, attorney general (*Stephen J. Judge*, associate attorney general, & a. on the brief, and *Mr. Judge* orally), *Daschbach, Cooper, Hotchkiss & Csatari*, of Lebanon (*Deborah J. Cooper* on the brief), and *Dewhurst & Greene, P.L.L.C.*, of Bedford (*Arthur G. Greene* on the brief and orally), for the State.

*Hale and Dorr L.L.P.*, of Boston, Massachusetts (*Stephen A. Jonas & a.* on the brief), for the Governor, as *amicus curiae*.

*Betsy B. Miller* and *Richard J. Lehmann*, of Concord, for the Speaker of the New Hampshire House of Representatives and the President of the New Hampshire Senate, as *amicus curiae*.

PER CURIAM. The State appeals orders of the Superior Court (*Galway*, J.) granting the plaintiffs' declaratory judgment petition, finding the statewide property tax unconstitutional as applied, and requiring the State to repay the $880 million collected under the tax to date. We reverse.

In December 1999, three property owners from three different communities filed a petition for declaratory judgment and injunctive relief challenging the constitutionality of the property tax as applied statewide. The plaintiffs challenged both the assessment method of the tax and the distribution method after collection. After a six-day bench trial, the trial court concluded that the statewide property tax as applied violates Part II, Articles 5 and 6 of the New Hampshire Constitution but that the distribution method does not violate the plaintiffs' right to equal protection. The trial court ruled that the State had agreed to repay $880 million if the tax was found unconstitutional and ordered that relief.

The issues before us are: (1) whether the trial court erroneously determined that the statewide property tax, as applied, violated Part II, Articles 5 and 6 of the New Hampshire Constitution; and (2) whether the trial court erroneously ruled that the State had an obligation to repay $880 million if the statewide property tax is found to be unconstitutional. The plaintiffs have not appealed the

trial court's ruling rejecting their equal protection claim, and therefore we do not address it.

## I. Facts

### A. The Legislation

Following our decision in *Claremont School District v. Governor*, 142 N.H. 462 (1997) (*Claremont II*), the legislature passed House Bill 117, establishing a statewide property tax to help fund the State's obligation to provide a constitutionally adequate public education. *See* Laws 1999, ch. 17. House Bill 117, however, contained a provision that allowed certain communities to phase in the full rate of the tax over five years, which this court found unconstitutional. *See Claremont School Dist. v. Governor (Statewide Property Tax Phase-In)*, 144 N.H. 210, 212 (1999) (*Claremont III*). The legislature subsequently passed House Bill 999, which reenacted the statewide property tax without the phase-in provision and provided that the tax will expire at the beginning of 2003. *See* Laws 1999, ch. 338.

House Bill 999 imposes a tax at the rate of $6.60 per $1,000 of the value on certain real property across the State. *See* RSA 76:3 (Supp. 2000). The New Hampshire Department of Revenue Administration (DRA) calculates the total amount of the statewide property tax to be raised by each municipality based upon the equalized value of the property within its borders. *See* RSA 76:8 (Supp. 2000). The New Hampshire Department of Education calculates the total amount of adequate education funds that each municipality needs to educate its students, based upon the number of students within its borders. *See* RSA 198:40 (1999). Under the statute's distribution formula, communities that raise more funds through the tax beyond that necessary to fund an adequate education for their students are required to pay the excess funds to the education trust fund for distribution to communities unable to raise sufficient funds to meet their cost of adequacy. *See* RSA 198:39, :41, :42, :46 (1999 & Supp. 2000). This has resulted in the characterization of some municipalities as "donor" communities and others as "receiver" communities, although House Bill 999 contains no such designations. The plaintiffs in this case are from "donor" communities.

For the 2000 tax year, $825 million was the amount required to fund an adequate education for each school child in the State. Of this amount, $442 million was raised through the statewide property tax. Of the $442 million, $418 million was distributed directly to the school districts of the municipalities where the money was collected. The remaining $24 million was placed in the education trust fund

with $383 million from the other revenue sources and distributed to municipalities with insufficient property values to raise an amount necessary to fund an adequate education in their school districts.

## B. The Tax Process

Statewide property tax bills reflect the equalized value of property as of April 1 of each year. *See* RSA 76:2 (1991); RSA 76:8, I (Supp. 2000); RSA 21-J:3, XIII (2000). The selectmen or the assessors in each municipality annually determine the local assessed value of the property within each municipality as of April 1. *See* RSA 74:1 (1991); RSA 75:8 (1991). Each municipality completes a form that lists the total value of its properties, the changes to its properties, and any exemptions and credits claimed. This information is supplied to the DRA.

RSA 21-J:3, XIII requires the DRA to "[e]qualize annually . . . the valuation of the property as assessed in the [municipalities] in the state . . . by adding to or deducting from the aggregate valuation of the property . . . such sums as will bring such valuations to true and market value of the property." The first step in the equalization process involves a ratio study which compares, within each municipality, the assessed property values submitted by the municipality to the sales prices of all properties sold in the municipality in the prior year. *See* RSA 21-J:9-a (2000). Sales information is provided to the DRA by a private company with which the State contracts to collect information from the registry of deeds in each county. The DRA then performs a sales screening process so as to include only "arms-length" transfers of property. *See id.* Assessing officials within each municipality are required to certify the information necessary for the DRA to conduct the annual sales-assessment ratio study. *See id.*

Once sales are screened, the DRA establishes an individual sales/assessment ratio based upon the sales and assessment information from each municipality for each property used in the study. The DRA then calculates three ratios based upon the assessment and sales information for each municipality. First, the median ratio is calculated by arraying the individual ratios from the highest to the lowest. The median ratio is the middle. Second, the mean ratio is calculated by averaging the individual ratios. Third, the weighted mean or aggregate ratio is calculated by dividing the sum of the assessed values for all properties in a community for which there have been sales by the sum of their sale prices. The DRA then determines which ratio best equalizes all of the property in each municipality. Most often, the DRA chooses the median ratio.

The DRA next uses the selected ratio to adjust the municipality's assessed values, either upward or downward, in order to approximate full value. As the DRA explains in its brochure:

> Adjustments are not made to any individual properties. Rather, the total value of all property in town is adjusted based upon the comparison of recent property sales with local property assessments. For example, if the comparison of recent sales indicates that on the average, the town is assessing property at 90% of market value, then the total local assessed value of the town would be increased by 10% in order to approximate the town's full value. If the comparison indicates that, on the average, the town is assessing at 105% of market value, then the total local assessed value would be decreased by 5%.

Once the equalized property valuations are determined, each municipality's equalized valuation is multiplied by $6.60 per $1,000 to determine the portion of the statewide property tax each municipality must raise. *See* RSA 76:8. To determine the rate paid by individual taxpayers, each municipality divides the uniform rate by the percentage that the DRA used to equalize its property.

The final step in the DRA's annual ratio study is to calculate the coefficient of dispersion (COD) for each municipality. The COD measures the percentage that individual municipality ratios, on average, deviate from the median ratio. A COD of ten, for example, indicates that the sales/assessment ratios in a municipality, on average, deviate from the median sales/assessment ratio by ten percent.

## II. Standard of Review

■■ Establishing "the rules by which each individual's just and equal proportion of a tax shall be determined is a task of much difficulty, and a very considerable latitude must be left to the legislature on the subject." *Opinion of the Justices*, 77 N.H. 611, 615 (1915) (quotation omitted). In reviewing the statewide property tax, we determine only whether there is a "clear conflict with the Constitution" in the tax as applied, and do not concern ourselves with whether the tax is "wise, reasonable, or expedient." *Petition of Boston & Maine Corp.*, 109 N.H. 324, 325-26 (1969) (quotation omitted). As we have often stated, our task is neither to establish educational policy nor to determine the appropriate mechanism for its funding. *See Claremont II*, 142 N.H. at 475. The statewide property tax law, like any legislative act, is presumed constitutional

and will not be declared invalid except upon "unescapable grounds." *Niemiec v. King*, 109 N.H. 586, 587 (1969) (quotation omitted).

We review the trial court's legal conclusions and application of law to fact *de novo*. *See Bursey v. CFX Bank*, 145 N.H. 126, 129 (2000). The trial court's "[f]indings of fact . . . are binding on us unless they are not supported by the evidence or are erroneous as a matter of law." *Blagbrough v. Town of Wilton*, 145 N.H. 118, 124 (2000) (quotation omitted).

## III. Part II, Article 5

### A. In General

■ Pursuant to Part II, Article 5 of the New Hampshire Constitution, the legislature is granted "full power and authority . . . to impose and levy proportional and reasonable assessments, rates, and taxes upon all inhabitants of, and residents within, the said state; and upon all estates within the same." In order for a tax to be proportional, all property in the taxing district must be valued alike and taxed at the same rate. *See Opinion of the Justices*, 99 N.H. 525, 527 (1955). Each taxpayer's property must be valued at the same percentage of its true value as all the taxable property in the taxing district and "shall be valued within a reasonable time before the tax is assessed." *Bow v. Farrand*, 77 N.H. 451, 451-52 (1915). A change in either the rate or the valuation affects the tax. *Opinion of the Justices*, 99 N.H. at 527; *see Opinion of the Justices*, 76 N.H. 609, 611 (1913).

■ Taxes must not merely be "proportional, but in due proportion, so that each individual's just share, and no more, shall fall upon him." *Rollins v. Dover*, 93 N.H. 448, 449 (1945) (quotation omitted). "[A]s any one's payment of less than his share leaves more than their shares to be paid by his neighbors, his non-payment of his full share is a violation of their constitutional right." *Id.* Nonetheless, "[t]he demand of constitutional equality in taxation anticipates some practical inequalities." *City of Berlin v. County of Coos*, 146 N.H. 90, 94 (2001). "Absolute mathematical equality is not obtainable in all respects if taxation is to be administered in a practical way." *Id.* (quotation omitted).

### B. Burden of Proof

■ The plaintiffs sought a declaration that the tax "as applied" violated Part II, Article 5. To prevail upon their declaratory judgment petition, the plaintiffs were required to show a "present legal or equitable right and an adverse claim." *Delude v. Town of*

*Amherst*, 137 N.H. 361, 363 (1993) (citation omitted). Such a petition cannot be based upon a set of hypothetical facts. *See id.* "There must be some action taken and harm done before [a statute] will be invalidated." *Id.* In the context of a challenge to a tax statute, the plaintiff is required to prove the "practical operation and effect" of the tax was unconstitutional. *Austin v. State Tax Comm'n*, 114 N.H. 137, 139 (1974), *reversed on other grounds*, 420 U.S. 656 (1975) (quotation omitted).

As the trial court recognized, the plaintiffs had the burden of demonstrating the statewide property tax was unconstitutionally disproportionate, as applied. *See Chasan v. Village District of Eastman*, 128 N.H. 807, 818-19 (1986) (plaintiffs have burden to prove disproportionality under Part I, Article 12 of New Hampshire Constitution). An "as applied" constitutional claim, in particular, requires proof of harm to the plaintiffs. *See Delude*, 137 N.H. at 364; *Austin*, 114 N.H. at 141. That the tax assessment procedures "may have allowed for illegal results does not end the matter. Rather, we must turn to the validity of the . . . procedures, as applied, to determine whether the plaintiffs in this case were injured." *Macioci v. Commissioner of Revenue*, 438 N.E.2d 786, 793 (Mass. 1982).

The plaintiffs did not assert that their own property appraisals were invalid or that they paid the statewide property tax based upon something more than the market value of their properties. Rather, they asserted that because properties in other municipalities were appraised at less than market value and because the DRA's equalization process is fundamentally flawed, other taxpayers paid the statewide tax based upon something less than market value. Accordingly, the plaintiffs claimed they bore more than their fair share of the statewide property tax burden.

We have not previously had the opportunity to articulate the burden of proof where the taxpayer's challenge is based upon the under-assessment of other taxpayers. In the *Claremont* cases, we were faced with either facial challenges to the education tax or challenges to the rate of taxation. In *Claremont II*, for instance, the issue was whether municipalities in the State had the same rate of taxation. *See Claremont II*, 142 N.H. at 470-71. At the time, the DRA computed a different property tax rate for each school district, based upon the revenue needed to meet that school district's budget. *Claremont II*, 142 N.H. at 467. This system resulted in property tax rates that differed among municipalities by as much as 400 percent. *Id.* at 470. Because the taxes were raised to fulfill a State purpose, we determined the State was the relevant taxing district, and we held that, in the context of a statewide tax, these varying property

tax rates violated Part II, Article 5. *Id.* at 470-71. To comply with Part II, Article 5, the statewide property tax "must be administered in a manner that is equal in valuation and uniform in rate throughout the State." *Id.* at 471.

In *Claremont III*, the issue was whether the tax, on its face, treated taxpayers in property rich communities differently from taxpayers in other communities. *See Claremont III*, 144 N.H. at 213 (quotation omitted). The legislation at issue in *Claremont III* established a statewide property tax "at the uniform rate of $6.60 on each $1000 of the value of taxable property." *Id.* (quotation omitted). The act, however, phased in the uniform rate of taxation over five years for fifty property rich towns across the State, while imposing it immediately upon the remaining towns. *Id.* We determined that the differential treatment afforded the property rich communities was not justified and was "so arbitrary as to serve no useful purpose of a public nature." *Id.* at 216 (quotation omitted). Accordingly, we held the phase-in provision violated Part II, Article 5. *Id.* at 216-17.

Courts interpreting uniformity clauses in other state constitutions have required taxpayers challenging the under-assessment of other taxpayers to establish a constitutional violation by proving more than merely that the others are under-assessed. For instance, taxpayers in New Mexico must show "substantial" inequality such that the inequality "amounts to an intentional violation of the essential principle of practical uniformity." *Hannahs v. Anderson*, 966 P.2d 168, 176 (N.M. Ct. App. 1998), *cert. denied*, 972 P.2d 351 (N.M. 1998) (quotation omitted). Taxpayers in Kansas are held to a similar burden.

> [U]niformity and equality in a constitutional and statutory sense does not require mathematical exactitude in the assessment valuation of property for taxation. . . . Mere excessiveness of an assessment or errors in judgment or mistakes in making unequal assessments will not invalidate an assessment, but the inequality or lack of uniformity, if knowingly high or intentionally or fraudulently made, will entitle the taxpayer to relief.

*Appeal of Andrews*, 851 P.2d 1027, 1030-31 (Kan. Ct. App. 1993).

As the Massachusetts Supreme Judicial Court has explained, "practically it is impossible to secure exact equality or proportion in the imposition of taxes but . . . the statutory aim should be towards that result by approximation at least." *Bettigole v. Assessors of Springfield*, 178 N.E.2d 10, 15 (Mass. 1961) (quotation and brackets

omitted). This equality of approximation "requires attempting equality of assessment in absolute good faith and the best abilities of the public officers charged with making valuations." *Id.* When a taxpayer alleges that he or she pays more than the taxpayer's just proportion, not because his or her land is assessed in excess of its fair cash value, but because the land of others is intentionally assessed at even lower percentages of full, fair value, the Massachusetts Supreme Judicial Court requires proof of specific facts showing a "widespread scheme of intentional discrimination," rather than merely isolated lack of uniformity, to prove the tax is unconstitutionally excessive. *Macioci*, 438 N.E.2d at 797. In Montana, as well, temporary inequalities will not establish a uniformity clause violation. Rather taxpayers must show intentional and systematic discrimination, constructive fraud or arbitrary action. *Patterson v. State Dep't of Revenue*, 557 P.2d 798, 803 (Mont. 1976).

■ We now hold that to establish a violation of the uniformity clause based upon the under-assessment of other taxpayers, a taxpayer must prove a systematic pattern of taxation that is not proportional and reasonable. To prevail, the taxpayer must prove specific facts showing a "widespread scheme of intentional discrimination." *Macioci*, 438 N.E.2d at 797. Isolated or inadvertent lack of uniformity will not suffice. *See id.* Intentional discrimination may be proved with direct evidence, or indirectly with proof of inequality or lack of uniformity substantial enough that intent may be inferred. *See Hannahs*, 966 P.2d at 176.

■ Thus, to prevail upon their declaratory judgment petition, the plaintiffs were required to establish they were harmed by the practical operation of the statewide property tax. Because the plaintiffs did not claim their own assessments were based upon something other than market value, but instead claimed that other taxpayers were under-assessed, the harm the plaintiffs were required to show was widespread intentional discrimination.

*C. Evidence of Flaws in System*

Evidence at trial established that the statewide property tax system as currently applied has significant shortcomings. In particular, there are five areas which raise serious concerns regarding the system's ability to achieve taxpayer proportionality and equality. As we explain in section D, these concerns, although serious, are insufficient to establish a constitutional violation.

## 1. Lack of Standards for Local Assessments

The DRA relies upon officials within each municipality to report the value of the taxable property therein. The DRA's Deputy Director for the Property Appraisal Division, Linda Kennedy, testified at trial that while local officials in each municipality are responsible for obtaining assessment values and reporting them to the State, different methods may be used to update property values within each municipality. Kennedy also testified that while the DRA audited assessments in municipalities with poor CODs in 1999, no comprehensive auditing procedures are yet in place to verify that assessments are being performed correctly and accurately at the local level. Kennedy acknowledged that the municipality's assessments, along with the sales price data, form the "keystone" of equalization.

Kennedy testified that under the DRA's administrative rules, a municipality may update property values in one of three ways. It may do a full "revaluation," which entails a full measure and list of all property within the municipality. A full revaluation involves physically inspecting property exteriors and may include inspecting property interiors. A municipality may also do a partial revaluation, which is a revaluation of a neighborhood or a class of property within a municipality. The third revaluation option is to use a sales analysis to update property assessments. The DRA's manual for assessors advises that revaluations and updates are "periodical necessities" to ensure equity within a municipality.

Some municipalities have undertaken a full revaluation of property recently, while others have not done so in decades. Standards promulgated by the International Association of Assessing Officers (IAAO) provide that

> property should be physically reviewed and reappraised at least every six years. This can be accomplished in at least three ways: (1) reappraising all properties at periodic intervals (e.g., every four to six years); (2) reappraising properties on a cyclical basis (e.g., one-fourth or one-sixth each year); and (3) reappraising on a priority basis as indicated by assessment-ratio studies or other considerations, while still ensuring that all properties are physically reviewed at least every sixth year.

Both the plaintiffs' and the State's experts endorsed this IAAO standard at trial. The plaintiffs' expert testified that there can be no consistency or reliability in a system that does not perform regular

revaluations of its taxable property and that without current, consistent data there can be no proportionality across taxpayers. The State's expert likewise agreed that while trending can be effective to update property data for short periods, full revaluations are required at regular intervals.

### 2. Lack of Standards for Exclusion of Sales

Upon receiving information from each municipality of the total assessed value of its properties, the DRA conducts a ratio study comparing the assessed values of each municipality's properties to the sales prices of all properties sold in the prior year in each municipality. Evidence at trial underscored the degree of discretion afforded the DRA in choosing the sales information included in the State's ratio study.

Kennedy testified that only "arms-length" sales are included in the ratio study and that she excludes all sales that she determines are not "arms-length." She also testified, however, that the DRA does not have any set procedures for including or excluding sales data; rather, those decisions are based solely upon her judgment.

In addition, the trial court found that as a result of the DRA's sales screening

> the sample sizes used in the sales analysis are very limited, with many exclusions, and with no set procedures or verification process for exclusion of sales. So many sales are excluded from the study, that these samples give very little indication of what percentage of town property is actually being used in the equalization process, or how indicative the samples are of the fair market value of property in any town across the State. In fact, the evidence presented demonstrates that some town[s'] ratios were calculated from studies based on as few as two property values.

The plaintiffs' expert also expressed concern about the extremely small samples used in the ratio study. He testified that the sample size in the DRA ratio study significantly affects the reliability of the statistics, especially when there are no confidence intervals calculated to monitor their reliability, and that change is necessary to achieve fairness in the study. Likewise, the State's expert testified that: (1) many of the sample sizes used in the ratio study were too small to generate confidence in the ratios produced; and (2) no confidence intervals were calculated by the DRA to determine whether its statistics were reliable.

### 3. Lack of Guidelines for Choice of Ratio

Once sales are screened, Kennedy establishes an individual ratio for each property used in the study by dividing the assessed value of the property by its reported sales price. She also determines the ratio to be used to equalize all of the property in each municipality. While in most instances the median ratio is chosen, other ratios may be used. Kennedy acknowledged that her choice of ratio affects the amount of tax a municipality must pay and that the DRA has no written policy governing her choice of ratio.

### 4. High CODs

As part of the DRA's annual ratio study, Kennedy calculates the COD for each municipality. The COD is defined by the DRA as the average percentage that ratios deviate from the median ratio for the community. The COD is a measure of equity within a municipality. The lower the COD, the greater the uniformity of assessments in a municipality and therefore the closer the municipality is to achieving equity of property values.

The DRA classifies CODs between zero and five percent as indicating excellent equity, between six and ten percent as good equity, between eleven and fifteen percent as average equity, between sixteen and twenty percent as borderline equity, and anything over twenty percent as unacceptable equity. The DRA's "Ratio and Coefficient of Dispersion Guidelines" recommend COD standards of ten percent or less for single-family residential property in new, more homogeneous areas, and fifteen percent or less for single-family residential property in older, heterogeneous areas and income producing properties in large, urban jurisdictions. The outside standard of twenty percent is recommended only for rural and seasonal property and vacant land.

Evidence at trial showed that under the DRA's own definitions, during the tax years in question at least half of the municipalities in the State had borderline to unacceptable CODs overall and unacceptable CODs in at least one class of property. In the DRA's 1998 Equalization Summary, 53.2% (124/233) of municipalities with a calculable COD had a COD of over fifteen percent. When groupings by different classes of property were analyzed, 51.7% (122/236) of municipalities had at least one class of property with a COD over twenty percent. In the 1999 Equalization Summary, it was reported that 45.5% (107/235) of municipalities had a COD of over fifteen percent. The stratified analysis revealed that 65.7% (148/225) of municipalities had at least one class of property with a COD of over twenty percent.

There is no statutory authority for the DRA to set rules on CODs. While the DRA recommends that municipalities stay within the COD guidelines, it did not have the authority to require municipalities to take corrective action. Under House Bill 999, however, the DRA now may petition the New Hampshire Board of Tax and Land Appeals to issue an order requiring a municipality to reassess property. *See* RSA 21-J:3, XXV (2000). Moreover, the DRA is authorized to monitor local assessments and supervise local assessors to ensure that appraisals are accurate. *See* RSA 21-J:11 (2000).

### 5. Lack of Verification

As noted above, there are few written guidelines and few quality control mechanisms. The DRA does not have comprehensive procedures to verify that assessments are being performed correctly and accurately at the local level. Expert testimony indicated that all local data should be validated through audit procedures. The trial court found that the need for local audits is heightened when the localities perform their own assessments and sales screening, because each locality may have a vested interest in achieving lower CODs and lower ratios, which directly affect the assessment of taxes. In addition, testimony highlighted the need to review the method by which sales are screened and to establish confidence intervals to monitor the reliability of the statistics used in the ratio study. Testimony provided by both sides' experts supports the trial court's finding that "New Hampshire and the DRA need to . . . perform audits of towns within the State to validate data, and calculate confidence and reliability indicators for all of their statistics used."

### D. Conclusion

We now decide whether, based upon the evidence presented to the superior court, the plaintiffs carried their burden of proving the statewide property tax was unconstitutional as applied under Part II, Article 5. We conclude that they did not.

The current system of administering the statewide property tax raises serious concerns as to whether it is proportional and reasonable, as required by Part II, Article 5. In section C we have described the evidence that supports the factual basis of our concerns. Much of that evidence came from expert witnesses for the plaintiffs and the State. They analyzed data and offered opinions upon various facets of the statewide property tax system, as well as

upon the system as a whole. After reviewing this testimony, the trial judge observed:

> The parties extensively debated at trial the statistical calculations and charts created by both [the State's expert] and [the plaintiffs' expert]. Errors were noted and recalculations performed, and the only point ultimately agreed upon was that none of the charts reflected the actual taxing situation occurring in New Hampshire.

The trial judge noted that the experts for both sides relied upon data from the DRA and "[i]f the underlying DRA data is flawed or unreliable, all calculations based on that data are also flawed and unreliable." The trial judge found that "none of the charts presented reflect the actual values and ratios used by the DRA" and concluded that "the numbers presented in all of the charts lack support to make them meaningful to the Court."

Notwithstanding the absence of conclusions based upon reliable statistical data, the trial judge ruled:

> What is clear from the expert testimony presented by both sides, is that without uniformity in assessments, sales, and ratios, without adequate sample sizes, without confidence intervals, and without full physical revaluations of property every five years to establish a base for a successful taxing system, the tax as applied is not equal in valuation [ ]or proportional across the State.

We agree that the plaintiffs failed to present statistical data that provided a comprehensive and reliable picture of the actual operation of the statewide property tax system. In our view, however, the absence of such evidence is fatal to their claim. What the plaintiffs proved was that the taxing system is flawed. What they did not prove is that the flaws resulted in a systematic pattern of disproportionate taxation. Nor did the plaintiffs prove that the flaws produced such substantial inequality that the inequality must be deemed intentional.

For instance, although there was evidence that the DRA has discretion to choose different ratios to equalize the value of property in different municipalities, the plaintiffs' experts did not testify that the use of different ratios resulted in the widespread failure to tax municipalities, and, derivatively, municipal taxpayers, at full market value. Based upon a study of thirty-three municipalities, the plaintiffs' experts testified that if the median ratio for each municipality had been used, the difference between the statewide

property tax the State actually collected in 1998 and the statewide property tax the State would have collected had they used the plaintiffs' experts' equalized values was .6 percent. As the State's expert explained, "it really doesn't make much difference" whether the median, mean or weighted mean ratio is used. "They're all pretty close together and they're usually not significantly different."

The plaintiffs' primary evidence of the flaws in the DRA's equalization process was a study of thirty-three municipalities. At trial, one of the plaintiffs' experts admitted that because he used the DRA's data, his study had the same flaws as the DRA's equalization study. The plaintiffs' expert testified that "to make a statistically valid analysis of assessments to other indications of market value, we would have either had to use more years of sales or commissioned appraisals to be done, and we would have then produced for one or more municipalities an equalization study that fully complied with the IAAO standards on ratio studies." Such a study would have given consideration "to the representativeness of the sales in the community to make sure that all types of property are adequately reflected [and] all value ranges are adequately reflected." The expert admitted that no such study had been conducted.

The plaintiffs also relied upon evidence that several municipalities have "unacceptable" CODs. A COD measures only the average variation of assessment/sale ratios from the median ratio. A high COD indicates that, on average, the assessment/sale ratios within a municipality vary from the median ratio to a large degree. It is a measure of uniformity within a municipality only. The State's experts testified that a COD of twenty percent or less complies with IAAO standards. In other words, the State's experts testified that it is permissible for assessment/sale ratios within a municipality to vary from the median ratio by at least twenty percent. The plaintiffs' expert admitted that, even if municipalities have CODs as high as twenty, forty or fifty percent, equalization can cure the disparities between municipalities.

Further, evidence that several municipalities have high CODs does not establish substantially disproportionate taxation. As the commissioner of the DRA explained at trial, proof that a municipality has an unacceptable COD for one type of property does not mean that all of the assessment/sale ratios in the municipality vary from the median ratio to a significant degree. The particular type of property with the unacceptable COD may represent only a small percentage of the total value of property in that municipality. Similarly, the DRA's 1999 equalization survey showed that munici-

palities with CODs of over twenty percent represent only seven percent of the total equalized value of property in the State.

The plaintiffs argued that because municipalities, such as the City of Keene, have not revalued property through physical inspections in many years, the taxing system necessarily results in disproportionate taxation. The evidence showed, however, that even though Keene has not revalued its property through a city-wide inspection in thirty years, the process it uses to assess property results in assessments that are within an acceptable range of market value.

By contrast, in *Claremont II*, the plaintiffs submitted clear and unambiguous evidence that the property tax as applied required taxpayers in different communities to pay different property tax rates. The evidence demonstrated that one municipality imposed a property tax rate that was over 400 percent higher than that in another municipality. *Claremont II*, 142 N.H. at 470. In this case, there was no evidence that any municipality was assessed the tax at anything other than the uniform rate. More importantly, on this record, we simply cannot determine the impact upon the plaintiffs or upon any other taxpayers of the system's administrative shortcomings.

■ It was the plaintiffs' burden to prove that the statewide property tax was unconstitutional as applied. Not only did they fail to produce evidence that their own property taxes were disproportionate, but they also failed to show that the taxes of other property owners were disproportionate. They did not demonstrate that the property of any taxpayer was not "valued alike," meaning at fair market value. *Opinion of the Justices*, 99 N.H. at 527; *see State Ex. Rel. Stephan v. Martin*, 608 P.2d 880, 886 (Kan. 1980) (uniformity clause requires that property taxation be assessed upon equal basis; equal basis provided by legislature is "fair market value in money"). Thus, in spite of evidence that the current system has deficiencies, the evidence was insufficient to show a systematic pattern of disproportionate taxation. *See, e.g., Gitney v. Berks County*, 635 A.2d 737, 743 (Pa. Commw. Ct. 1993).

*IV. Part II, Article 6*

*A. Violation*

Part II, Article 6 of the New Hampshire Constitution states that "there shall be a valuation of the estates within the state taken anew once in every five years, at least, and as much oftener as the general court shall order." The plaintiffs and the trial court interpret Part

II, Article 6 to require full physical inspections of all property within the State every five years. We disagree.

"In interpreting an article in our constitution, we will give the words the same meaning that they must have had to the electorate on the date the vote was cast." *Claremont School Dist. v. Governor*, 138 N.H. 183, 186 (1993) (quotation omitted). "In so doing, we must place ourselves as nearly as possible in the situation of the parties at the time the instrument was made, that we may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Id.* (quotation and brackets omitted).

In New Hampshire, from the period of the establishment of the colony to the Revolution, a system of taxation was built upon the theory of taxing every person according to the person's income. *See Opinion of the Justices*, 76 N.H. 588, 593 (1911). This system continued until 1789, "when the income theory was permanently abandoned and the taxation of every person in proportion to his estate was substituted." *Id.* at 593-94 (quotation and ellipses omitted).

From the adoption of the constitution in 1784 until 1833, "all property taxed was not annually appraised, but much of the property taxed was rated by legislative act," the value of which was set by the legislature at least every five years. *Id.* at 593. Inventories based upon these values were prepared by the selectmen in each municipality and submitted to the legislature. Taxes were apportioned among municipalities based upon the values contained in the inventories. *See* M. ROBINSON, A HISTORY OF TAXATION IN NEW HAMPSHIRE 38-39 (1902).

When Part II, Article 6 was adopted in 1784, "[i]t was known how estates had been valued since 1770, and in ordering a new valuation every five years like legislative action was expected." *Opinion of the Justices*, 76 N.H. at 595. The framers thus did not intend for there to be physical inspections of property every five years. Rather, they intended that the legislature value large classes of property every five years by legislative act.

"After the change in the theory and practice of taxation in 1789, more attention was given to the valuation of property included in the inventory and to the taxation of new forms of personal and real property." *Id.* at 594.

> Changes in the valuation of real estate were especially marked. In 1803, the valuation of land was advanced, especially when compared with live stock, one of the chief items of the inventory. Again in 1830, a general reduction of

nearly twenty-five per cent was made in the valuation of all classes of property that were arbitrarily rated by legislative act. In a few cases, however, the valuation was increased. Such a general readjustment indicates clearly that values were undergoing radical changes, and that the old method of rating large classes of property by the legislature for a term of years had become, under the influence of a new industrial era, unsuited to the conditions. A fixed list was extremely convenient while values remained stable, and proved equitable and hence satisfactory in its workings. When values began to change rapidly and new forms of property were appearing, the market price was nearer the just price than any that could be fixed months in advance by the legislature.

*Id.* at 594-95 (quotation omitted). Accordingly, in 1833, the legislature abandoned the rating system. *See id.* at 594. In its place, the legislature adopted "a less arbitrary method . . . providing that all taxable property should be appraised at its true value in money by the local assessors." *Id.* at 595 (quotation omitted). "The purpose of the act of 1833, from its terms, evidently was to change the mode in which property was to be valued, so as to provide for an appraisal, as a more equal mode than an arbitrary valuation at certain sums for different kinds of property." *Smith v. Burley*, 9 N.H. 423, 427 (1838). Individual property appraisals were thus not required until 1833.

■ ■ Part II, Article 6 governs the valuation of property for taxation purposes. While it does not require physical inspections, it does require that property be assessed at market value at least every five years. *See Opinion of the Justices*, 76 N.H. at 596. Property assessment entails both a physical description of the property's features and size and a determination of the unit values for different classes of property.

■ The legislature has enacted a property assessment process that we believe, if complied with, would satisfy and, even exceed Part II, Article 6's requirements. The legislature continues to require that taxable property be assessed "at its true and full value in money." RSA 75:1 (1991). Since at least 1876, the General Court has required local assessors and selectmen annually to examine all the real estate in their respective cities and towns and to reappraise any real estate that has changed in value since the last appraisal. *See* RSA 75:8 (1991); *Hill v. Marvin*, 98 N.H. 519, 522-23 (1954). The legislature has also granted the DRA authority to "monitor apprais-

als of property and supervise appraisers" to ensure that appraisals "comply with all applicable statutes and rules." RSA 21-J:11, II. This system provides a reasonable process for determining the market value of property within each municipality every year.

The evidence at trial, however, established that some municipalities are not complying with the statutory directive to appraise property annually, or even the constitutional mandate to appraise it every five years. For instance, at trial, Kennedy testified that as of 2000, approximately seventy municipalities had failed to perform a full revaluation, partial revaluation, or update of property values since 1994 "that [the DRA] had knowledge of." This failure is a violation of the State's obligation to enforce Part II, Article 6. *See Opinion of the Justices*, 76 N.H. at 595.

### B. Remedy

Based upon this violation of Part II, Article 6, the plaintiffs seek to declare the entire statewide property tax scheme unconstitutional as applied. We cannot declare a taxing scheme invalid as applied, however, absent proof of harm. *See Delude*, 137 N.H. at 364; *Austin*, 114 N.H. at 141. The plaintiffs did not prove harm. While the evidence showed the State has failed to ensure municipal assessments every five years, it did not show that this failure resulted in disproportionate taxation. *See Opinion of the Justices*, 76 N.H. at 596 (Part II, Article 6 requires "appraisals of the property to be taxed at its fair value, so that proportional taxes might be laid"); *Thompson v. Kidder*, 74 N.H. 89, 95 (1906) ("Article 6 . . . was intended to secure proportional assessments by requiring frequent revaluations"). We thus reverse the trial court's declaration that the statewide property tax is unconstitutional as applied, and, accordingly, reverse its order requiring the State to return all of the statewide property taxes already collected.

We conclude, however, that the State must implement appropriate enforcement measures to ensure that each municipality assesses property within its borders every five years, as required by Part II, Article 6. The record in this case shows that steps are already being taken to enforce the current statutory scheme. Because the present statewide property tax is scheduled to expire in 2003, the State should have at least until then to develop effective enforcement measures. The people of this State should be able to rely upon the good faith and common sense of the executive and legislative branches to take the necessary action, not just because by doing so the State may avoid future successful legal challenges,

but because that is the essence of our constitutional form of government.

*Reversed.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred ; BROCK, C.J., and BRODERICK, J., dissented.

BROCK, C.J., and BRODERICK, J., dissenting. Because the trial court's findings in this case are supported by the evidence and not erroneous as a matter of law, we would affirm its analytically sound and thoughtful ruling that the statewide property tax as currently administered violates Part II, Article 5 and Part II, Article 6 of the State Constitution and remand the issue of remedy. We therefore respectfully dissent.

*I. Burden of Proof*

The majority today adopts a new standard, not even advocated by the State in the trial court, requiring proof of a widespread scheme of intentional discrimination to prove a violation of Part II, Article 5. In doing so, the majority raises the bar significantly for taxpayers challenging unequal and unfair taxing schemes. We view this heightened standard as potentially "leading to frustration of the document upon which our government rests." *Opinion of the Justices (School Financing)*, 142 N.H. 892, 903 (1998). "[T]hose who crafted the words of Part II, Article 5 had lived under the taxation policies of the British Crown [and] [i]t undoubtedly was the specter of unfair taxation that prompted the requirement that taxes be both proportional and reasonable." *Id.* In keeping with this near sacred trust, we must be vigilant not to allow the clamor of the day to drive, define or undermine cherished constitutional protections.

The principles of proportionality and uniformity in taxation exist to protect the citizens of this State from arbitrary taxation. It is for the legislature to enact schemes of taxation that comport with the constitutional limitations, not for the taxpayers to bear an undue burden to protect themselves from violations of fundamental principles. *See State v. Express Co.*, 60 N.H. 219, 237 (1880) ("The citizens are entitled to require that the legislature itself shall cause all public taxation to be fair and equal in proportion to the value of property, so that no one species of property may be unequally or unduly assessed." (quotation omitted)).

"[T]he constitution enforces the idea that the sovereignty is in the people, and that all the power not expressly delegated to the legislature was reserved to the people." *Id.* at 235. "While the power

of the legislature to raise a revenue for the support and defence of the government is absolute, the way in which it may be exercised is specifically set forth, and the method designated must be followed." *Id.* For well over one hundred years, cases interpreting the practical meaning of Part II, Article 5 have affirmed its restriction on the scope of the power to tax.

Seeking a declaration that the statewide property tax, as applied, is unconstitutional, an injunction against further collection of the tax, and reimbursement of monies collected under the tax, the plaintiffs filed a petition for declaratory and injunctive relief. Given that legislative acts are presumed constitutional and will not be declared invalid except on "unescapable grounds," *Niemiec v. King,* 109 N.H. 586, 587 (1969) (quotation omitted), the plaintiffs in this case were already faced with a heavy burden to demonstrate that the property tax statute, as applied, is unconstitutional. The burden of proof associated with these requests differs and we disagree that in order to establish, as a matter of law, that the tax as applied violates the constitutional requirements of proportionality and equality these plaintiffs were required to show that they were individually harmed by the practical operation of the statewide property tax.

The statute governing declaratory relief states that "[a]ny person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties, and the court's judgment or decree thereon shall be conclusive." RSA 491:22, I (1997). The purpose of the declaratory judgment statute "is to make disputes as to rights or titles justiciable without proof of a wrong committed by one party against the other." *Faulkner v. Keene,* 85 N.H. 147, 149 (1931).

> The remedy of declaratory judgment affords relief from uncertainty and insecurity created by a doubt as to rights, status or legal relations existing between the parties. . . . Petitions for declaratory relief must be liberally construed so as to effectuate the evident purpose of the law.
>
> Although commonly placed on the equity docket, . . . petitions for declaratory judgment are *sui generis* as they partake of some of the characteristics of both law actions and equity proceedings. . . . They provide relief when other proceedings would be inadequate. The legislature created declaratory relief as a means for parties to determine their legal or equitable rights at an earlier stage than

would be possible if the matter were pursued in other established forms of action.

*Radkay v. Confalone*, 133 N.H. 294, 296-97 (1990) (quotations, citations and brackets omitted). We have long held that "[a] petition for a declaratory judgment is particularly appropriate to determine the constitutionality of a statute when the parties desire and the public need requires a speedy determination of important public interests involved therein." *Chronicle &c. Pub. Co. v. Attorney-General*, 94 N.H. 148, 150 (1946).

In contrast to abatement cases, we find no requirement in our law that plaintiffs challenging the constitutionality of a statute through a declaratory judgment action must demonstrate that they suffered actual, individual pecuniary harm as a result of the alleged unconstitutionality. *Compare Appeal of Town of Sunapee*, 126 N.H. 214, 217 (1985) (to receive abatement of taxes, taxpayer must establish that his property is assessed at higher percentage of fair market value than percentage at which property is generally assessed in the town), *and Stevens v. City of Lebanon*, 122 N.H. 29, 32 (1982) (in abatement action plaintiff has burden of proving that he is paying more than his proportional share of taxes), *with Delude v. Town of Amherst*, 137 N.H. 361 (1993).

In *Delude v. Town of Amherst*, cited by the majority to support its conclusion that the statewide property tax, as applied, cannot be declared invalid because the plaintiffs failed to prove individual harm, we noted that the "harm" requirement is not satisfied if the plaintiffs set forth merely theoretical controversies. *See Delude*, 137 N.H. at 363. The controversy before us in this case, however, is far from theoretical.

The plaintiffs in *Delude* sought a determination that a Town of Amherst zoning ordinance relating to mobile homes violated State statute, as well as the equal protection and due process provisions of the State Constitution. *Id.* at 362. Prior to applying for approval to the town planning board to build a manufactured housing park, the plaintiffs concluded that their application would probably be denied and, therefore, elected to file a petition for declaratory judgment based on "sundry vague and conclusory allegations." *Id.* at 363-64.

This court agreed that the plaintiffs failed to present facts which demonstrated a present legal or equitable right to which the town was asserting an adverse claim. *Id.* at 364. Instead of filing an application for the town's approval of their plan or applying for a variance as the town had suggested, "[t]he plaintiffs merely spec-

ulated as to what the town would do if they were to file an application for approval, or if they were to apply for a variance." *Id.* at 364. Consequently, there was no present legal or equitable right presented by the plaintiffs upon which to invalidate the challenged statute. Unlike *Delude*, of course, the case before us involves a "justiciable controvers[y] of sufficient immediacy and reality as to warrant action by the courts." *Id.* This is the "harm" required to give grounds for judicial relief. There is nothing hypothetical about New Hampshire's statewide property tax or the manner in which it operates.

The issue of actual, individual pecuniary harm is, however, relevant to the scope of the remedy to which the plaintiffs may be entitled. Where, as here, the plaintiffs have shown that the statewide property tax, as applied, contravenes the Constitution, they are not entitled to relief unless they show that as a result of the statewide tax, they suffered an injury. As the plaintiffs' brief explains, the parties understood that the trial court's decision on the constitutionality of the statewide property tax, as applied, would be appealed to this court prior to a consideration of an appropriate remedy. While evidence of actual harm would be relevant to remedy, it is premature at the declaratory judgment stage. We would conclude, therefore, that the plaintiffs satisfied all existing requirements imposed on a party seeking a declaration that the statewide property tax, as applied, is unconstitutional.

The majority, however, adopts the position that in order for the plaintiffs to prevail on their declaratory judgment petition, they had to establish individual harm from the practical operation of the statewide property tax by proving a "widespread scheme of intentional discrimination." We are concerned that the majority has set the standard so high that it is no longer practical for taxpayers to challenge the constitutionality of a tax under Part II, Article 5. In doing so, the legislature has been provided a degree of protection never envisioned by the drafters of our State Constitution, thereby allowing for "precisely the kind of taxation and fiscal mischief from which the framers of our State Constitution took strong steps to protect our citizens." *Claremont School Dist. v. Governor*, 142 N.H. 462, 465 (1997) (*Claremont II*).

Of equal concern is that the cases relied upon by the majority, in our judgment, do not support this heightened standard. To support its new standard, the majority places considerable reliance on *Austin v. State Tax Comm'n*, 114 N.H. 137 (1974), which addressed the constitutionality of a commuter tax on nonresidents under the Privileges and Immunities and Equal Protection Clauses of the

Constitutions of the United States and New Hampshire. *See id.* at 139-40 (relying on configuration of Maine statute to find New Hampshire statute constitutional). The decision, however, is based completely on standards established under the federal Privileges and Immunities Clause, thereby having no practical application to an analysis of a statewide property tax, as applied, under Part II, Article 5 of the New Hampshire Constitution. *See id.* Furthermore, *Austin* was reversed by the United States Supreme Court because the commuter tax conflicted with the principle of comity. *See Austin v. State of New Hampshire*, 420 U.S. 656, 668 (1975) (constitutionality of New Hampshire statute affecting nonresidents may not depend upon present configuration of Maine statute).

In *Austin v. State Tax Comm'n*, 114 N.H. 137, we found that the evidence presented did not "create the substantial difference in treatment which would sustain plaintiffs' burden in proving the tax discriminatory to the point of being arbitrary and unreasonable." *Id.* at 140 (quotation omitted). Because the tax was not discriminatory in its practical operation, we held that it did not violate the Privileges and Immunities Clause or Equal Protection Clause of the Federal or State Constitutions. *See id.* at 141.

Reversing this decision, the United States Supreme Court concluded that "[w]hen a tax measure is challenged as an undue burden on an activity granted special constitutional recognition, . . . the appropriate degree of inquiry is that necessary to protect the competing constitutional value from erosion." *Austin*, 420 U.S. at 662. The Court found the tax on nonresidents discriminatory and at odds with the principles of comity embodied in the Privileges and Immunities Clause. *See id.* at 665-68. Thus, the harm the tax measure posed to the constitutional principle of comity prevailed over the State's contentions that the ultimate burden imposed on nonresidents was not more onerous in effect than that imposed on residents. *See id.* at 665-66.

The rule from these cases is that we should be vigilant in applying the appropriate degree of scrutiny to a tax measure that threatens a constitutional right. Here, the right threatened is the "special constitutional recognition" that proportionality and uniformity in taxation will protect the citizens of this State from arbitrary taxation. The focus should be to preserve a meaningful avenue to challenge arbitrary taxation, not to create impenetrable barriers that insulate tax schemes from review. Therefore, we believe that the majority errs by relying on *Austin* to form the foundation for a heightened burden of proof that will have the unfortunate effect of eroding the rights guaranteed under Part II, Article 5.

Furthermore, the majority relies on several intermediate appellate court decisions from other States. We find these cases of little value in deciding the constitutionality of a New Hampshire statute "because the constitutional provisions at issue contain language dissimilar to ours and were adopted under circumstances different from those existing in New Hampshire in the 1780s." *Claremont School Dist. v. Governor*, 138 N.H. 183, 186 (1993) (*Claremont I*). Nevertheless, upon close reading, these cases largely support our conclusions in this case.

New Mexico, Kansas and Montana have comprehensive statutory tax plans to ensure uniform and equal taxation among taxpayers. These States are one step beyond New Hampshire's current state of affairs, because New Hampshire presently lacks a comprehensive mechanism to effectively and fairly carry out statewide assessments. As such, it is more appropriate to examine cases from these jurisdictions that precede those cited by the majority.

For instance, in Kansas, detailed statutory guidelines assist in determining whether uniformity and equality is met by assessments of real property. *See Appeals of Andrews*, 851 P.2d 1027, 1031-32 (Kan. Ct. App. 1993). Indeed, assessments "'which take into account only some of the pertinent statutory factors . . . cannot be upheld where evidence indicates there has not been a uniform and equal rate of assessment and taxation in the [taxing district].'" *Id.* at 1032 (*quoting Bd. of Johnson County Comm'rs v. Greenshaw*, 734 P.2d 1125, 1131 (Kan. 1987)). New Hampshire lacks such comprehensive guidelines by which to evaluate whether taxation is uniformly and equally assessed. In fact, in the case before us, the plaintiffs proved the extraordinary amount of discretion afforded the department of revenue administration (DRA) in determining what information to include in the State's equalization process. Under the Kansas Supreme Court rule, we believe that the evidence presented in this case "*indicates* there has not been a uniform and equal rate of assessment . . . ." *Bd. of Johnson*, 734 P.2d at 1131 (emphasis added).

The New Mexico intermediate court in *Hannahs v. Anderson*, 966 P.2d 168 (N.M. Ct. App. 1998), cites a rule of law established by *Ernst W. Hahn, Inc. v. County Assessor*, 592 P.2d 965, 969 (N.M. 1978). In *Hahn*, the New Mexico Supreme Court stated that

[a] uniform method of taxation requires that each reappraisal be part of a systematic and definite plan which provides that all similar properties be valued in a like manner. . . . The constitutional defect in this case is the

absence of any systematic and definite plan for the reappraisal of all lands in [the county]. Without such a plan, there is no assurance of uniformity of appraisal method or of sequential selection of property for reappraisal.

*Id.* (quotation omitted). The uniformity clause of the New Mexico Constitution "requires uniformity of property taxation within a county as well as statewide uniformity of assessments." *Id.* In *Hahn*, this sole defect, the absence of a comprehensive county plan for reappraisal, was enough for the New Mexico Supreme Court to find taxation without such a plan unconstitutional. *See id.*

In *Patterson v. State, Department of Revenue*, 557 P.2d 798 (Mont. 1976), the Supreme Court of Montana addressed the constitutionality and legality of a cyclical five-year revaluation plan of taxable property. We reiterate, however, that this situation is one step beyond the current system in New Hampshire, where property valuations are largely outdated and are not the product of a systematic plan. We turn, instead, to *Larson v. State*, 534 P.2d 854 (Mont. 1975), the foundation for *Patterson*. In *Larson*, the absence of a statewide appraisal plan resulted in a lack of uniformity and equality of taxation between taxing districts. *See id.* at 858. The appraisal method employed in *Larson* was found to increase taxable valuations in one county to a level that exceeded valuations in other counties. *See id.* at 857. "The obvious result" was a disproportionate share of the tax burden placed upon one county over another. *Id.* at 857.

Finally, the majority cites *Bettigole v. Assessors of Springfield*, 178 N.E.2d 10, 15 (Mass. 1961), which cites *Cheshire v. County Commissioners*, 118 Mass. 386 (1875), for the proposition that "[p]ractically it is impossible to secure equality or proportion in the imposition of taxes but . . . the statutory aim should be towards that result, by approximation at least." (Quotations and brackets omitted.) We recognize that Massachusetts is an exception to our general caution not to look to other jurisdictions in interpreting our Constitution. *See Claremont I*, 138 N.H. at 186 (citing *McDuffy v. Secretary of the Executive Office of Education*, 615 N.E.2d 516 (Mass. 1993)).

In *Cheshire*, the court ruled that the Massachusetts Constitution forbids unequal or disproportionate taxation "whether that discrimination is effected directly in the assessment or indirectly through arbitrary and unequal methods of valuation." *Cheshire*, 118 Mass. at 389. The court found that the tax "directly and necessarily" produced disproportion in assessment and that "it is immaterial

whether the effect upon the general distribution of the tax be great or small, it is equally in violation of the Constitution, and therefore not within the legitimate authority of the Legislature." *Id. Bettigole* relied upon *Cheshire* in finding that a town's assessment practices, resulting in discrepancies in taxing different classes of property, were "deliberate and intentional." *Bettigole*, 178 N.E.2d at 15.

After *Bettigole*, Massachusetts amended its constitution and then passed legislation allowing classes of property to be taxed differently. *See Macioci v. Commissioner of Revenue*, 438 N.E.2d 786, 789 (Mass. 1982) (*Macioci I*). The commissioner of revenue, to assure uniformity and equality of taxation within each classification, adopted guidelines for valuation and assessment. *See id.* at 789-90. In *Macioci I*, a tax abatement case, the Massachusetts Supreme Judicial Court found that reliance upon an equalization study which was "sloppy" and utilized the mean, not the median, to arrive at its conclusions was illegal. *See id.* at 795-96. Further, the court ruled that the method followed by the tax commissioner and assessors "was illegal and improper in that it did not cause each sub-class of property in [the taxing district] to be factored to 100% of full and fair cash value." *Macioci v. Commissioner of Revenue*, 500 N.E.2d 275, 277 (Mass. 1986) (*Macioci II*) (quotation omitted).

In discussing the appropriate *remedy* for the improper assessment of taxes under a specific statutory scheme, the court denied the relief requested for failing to demonstrate that the taxes were "wholly void." *Id.* at 280. In Massachusetts, for a tax to be void under the specific statutory scheme, one must demonstrate a "'widespread scheme of intentional discrimination.'" *Macioci I*, 438 N.E.2d at 797 (quoting *Sears, Roebuck and Co. v. City of Somerville*, 298 N.E.2d 693, 695 (Mass. 1973)). The burden of proof "relates *only* to an action at law to secure adjustment of an excessive tax," *Sears, Roebuck and Co.*, 298 N.E.2d at 695 n.4 (emphasis added), and does not foreclose "[o]ther remedies to correct nonproportional assessment and assessment at less than 100% of full, fair cash value . . . [including] . . . declaratory and injunctive relief . . . ." *Id.; see also D'Errico v. Board of Assessors of Woburn*, 424 N.E.2d 509, 512 (Mass. 1981). The Massachusetts cases make it clear that the "widespread scheme of intentional discrimination" standard applies in determining, at the remedy phase of an abatement proceeding, whether a tax is wholly void. The standard is not applicable to a constitutional challenge of a New Hampshire property tax statute, as applied.

We conclude that the cases cited by the majority provide, at best, unstable footing upon which to adopt a new, stricter burden of proof

in this case. We find no support in the case law for shifting protection away from core constitutional principles in favor of unduly insulating the legislature from legitimate scrutiny of enacted tax statutes. We are unwilling, two hundred and seventeen years after the adoption of the New Hampshire Constitution, to dilute the protection afforded by Part II, Article 5 simply because the legislature may have found it more expedient to implement the current tax system rather than take steps to bring the system into constitutional compliance.

*II. Part II, Article 5*

The majority implies that the plaintiffs' case was an attempt to prove that some other taxpayers in the State are under-assessed as a result of the administration of the statewide property tax. We interpret the plaintiffs' case as encompassing the much broader concern that under the statewide property tax, as applied, there is simply no basis upon which one could conclude that any taxpayer in this State is being taxed in accordance with the principles of proportionality, uniformity and equality.

The summary of the evidence in this case, so well presented in the majority opinion, describes the five main areas of concern with the current statewide property tax, including lack of standards for local assessments, lack of standards for exclusion of sales, lack of guidelines for choice of ratio, high CODs and lack of verification. Although we reject the standard of "widespread scheme of intentional discrimination" adopted by the majority, we believe that the evidence in this case is sufficient to satisfy it and conclude that the current property tax system is in "clear conflict with the Constitution." *Petition of Boston & Maine Corp.*, 109 N.H. 324, 326 (1969). As such it "must be declare[d] . . . inoperative because the Constitution, and not the statute, is the paramount law." *Id.* (quotation omitted).

The evidence at trial showed that varying methods are used in each municipality across the State to establish property values upon which the tax is based and that some municipalities use current revaluation data while others rely on data that is decades old. This lack of a uniform standard for local assessments results in a system that is insufficient to establish equality *among taxpayers* across the State. "[E]ach taxpayer is entitled to have his property valued for taxation by the same standard as that of other taxpayers." *Bemis &c. Bag Co. v. Claremont*, 98 N.H. 446, 450 (1954). "A change in either factor, the rate or the valuation, affects the product, which is the tax, in the same way; and in order that the tax may be equal and

proportional, all property must be valued alike and taxed at the same rate." *Opinion of the Justices*, 76 N.H. 609, 611 (1913).

Extensive testimony and other evidence demonstrated that when applied to a statewide taxing system, the equalization process upon which the State relies to achieve equity in taxation *among towns* is similarly deficient. It is undisputed that equalization has no effect on equality among taxpayers and the State's expert emphasized that "equalization is not a cure for deficient assessment practices at the local level." As the majority opinion explains, the annual equalization process is based on a ratio study which lacks any procedures for screening sales, produces such small samples that the reliability of the statistics are suspect, applies different ratios to equalize property across the State, and lacks quality control mechanisms to verify the accuracy of the statistical information upon which the DRA relies. The trial court concluded: "The entire process of equalization is based on multiple levels of inconsistent procedures and formulas, which as applied to individual taxpayers in the State, do not allow for an equal valuation of properties across the State."

The majority reasons, however, that the absence of comprehensive statistical data is fatal to the plaintiffs' claims because without such data the plaintiffs failed to prove that the flaws in the system "resulted in a systematic pattern of disproportionate taxation" or "produced such substantial inequality that the inequality must be deemed intentional." We strongly disagree. First, statistical data is of little, if any, relevance to the issue of taxpayer-to-taxpayer inequality. Second, we think the majority underestimates the significance of the flaws in the system and their cumulative effect on the fairness of the tax.

All of the expert witnesses agreed that the equalization process only attempts to establish equity across towns and not taxpayers. The trial court concluded:

> The fatal constitutional flaw of [the tax statute] is the State's failure to acknowledge that the taxpayers in the State must have their property valued equally, rather than just the total property values being equalized across the towns. Equality across individual taxpayers is required to meet the *Claremont* mandates, that any property tax imposed be both "proportional and reasonable" and "equal in valuation and uniform in rate." The focus must be on equality and uniformity across all individuals in the entire taxing district, not only across all towns within the taxing district. This is where [the statute] does not meet consti-

tutional standards. As Commissioner Arnold testified, the legislature did not have the time nor the resources to re-work the entire New Hampshire tax system to comply with the *Claremont* mandate, so it adopted the past method of equalization that had been used for both the local and county tax systems, and applied a uniform rate.

Statistics are not necessary to prove the obvious: a tax system that fails to value property equally taxpayer-to-taxpayer, by its very nature, creates disproportionality.

By way of illustration, assume that the City of Concord consists of 259 neighborhoods. Within those neighborhoods, some establish property values based on full revaluations including full physical inspection of all properties; some base value on physical inspection of only some of the properties in the neighborhood; other neighborhoods establish value by using the property assessments from the previous year and adjusting them by the inflation rate and sales that occurred within the neighborhood; and some neighborhoods simply take the previous year's assessments and add or subtract value based on information reported by the property owners. Assume also that thirty percent of the neighborhoods have not adjusted values at all in over seven years. If the City of Concord issued property tax bills based upon these discrepancies in valuation of property throughout the neighborhoods, this court would not hesitate to conclude that such wide disparities in valuation violates the principle embodied in Part II, Article 5 that valuation methods employed must be uniform as to each taxpayer's property in the taxing district. *See Bemis &c. Bag Co.*, 98 N.H. at 450; *Opinion of the Justices*, 76 N.H. at 611; *Opinion*, 4 N.H. 565, 569 (1829).

Nonetheless, it is this very scenario which the majority upholds today. Under the statewide property tax, the State is comprised of 259 municipalities, or "neighborhoods," each of which establishes property values for taxation by different methods. It is undisputed that seventy-one "neighborhoods" in the State have failed to update property values *at all* in at least seven years, in violation of both statute and Part II, Article 6 of the State Constitution. The majority does not explain how equality among taxpayers across the State can be achieved when some taxpayers are taxed on property values established by full appraisals conducted within the previous year while others are taxed on property values established over seven years ago. We find it "unescapable" that such a tax scheme violates the constitution.

These significantly flawed property values form the basis for equalization and this flaw is exacerbated by additional defects

present in that process, described by the plaintiffs' expert as "one of the most deficient in the nation." For example, a ratio study is conducted comparing the locally assessed property values submitted by each town to the sales prices of all properties sold in each town in the prior year. The DRA, however, has complete discretion in choosing the sales information to be included in the ratio study and there are no set procedures for including or excluding sales.

The majority points to a lack of evidence that the use of different ratios to equalize the value of property in different towns results in failure to tax property owners at full market value. As the State's expert testified, however, the ratio chosen should be used consistently throughout the taxing district, which in this case is the entire State. This is consistent with our case law. *See Appeal of Andrews*, 136 N.H. 61, 64 (1992) ("In order to achieve proportionality all taxpayers must be assessed at the same ratio."). DRA employee Linda Kennedy acknowledged in her testimony that the choice of the ratio affects the equalized valuation, which in turn affects the tax assessed on each taxpayer. In addition, the DRA has complete discretion in choosing the ratios used to equalize different towns and although that choice affects the tax assessed, there is no set ratio, formula or procedure for determining which ratio to apply.

As we cautioned in *Claremont II*, "[t]o the extent that the property tax is used in the future to fund the provision of an adequate education, the tax must be administered in a manner that is equal in valuation and uniform in rate throughout the State." *Claremont II*, 142 N.H. at 471. The plaintiffs in this case proved that under the statewide property tax, different methods are used to establish values within each town and there is no comprehensive process in place for the DRA to verify that assessments are being performed correctly and accurately at the local level. There is nothing fair or just about taxing property owners in one town on values determined in the current year and taxing property owners in another town on values determined seven or more years earlier. *See id.*

Pursuant to Part II, Article 5, all taxpayers in this State are entitled to proportional taxation which requires that all property in the State be valued alike. The undisputed evidence at trial was that this is not being done. We think it matters little whether this clear constitutional violation is a result of intentional discrimination in adopting the taxing scheme or not. Given the extensive flaws in the system, we would agree with the trial court's conclusion that the statewide property tax scheme is constitutionally deficient and that the plaintiffs met their burden of proof.

*III. Part II, Article 6*

The majority concludes that the failure of approximately seventy municipalities to perform a full revaluation, partial revaluation, or update of property values since at least 1994 is a violation of Part II, Article 6. The majority holds, however, that because the plaintiffs failed to prove that this acknowledged violation resulted in disproportionate taxation, it does not render the statewide property tax, as applied, unconstitutional. In requiring specific proof of disproportionality, the majority diminishes the protection embodied in the constitution and, in our opinion, mistakenly interprets the intent of this provision.

The years from 1784 to 1833 saw a gradual change from taxation in proportion to income to taxation in proportion to property, and from fixed valuation according to property type to appraisal of individual property to determine value. "Since 1833, the legislative and judicial construction of the constitution has been that an equal division requires a proportional valuation of all property taxed and the assessment of all at the same rate." *Opinion of the Justices*, 76 N.H. 588, 591 (1911). While "the full effect of the constitutional provisions was probably not at first appreciated," since the early 1800s, "[t]he universal understanding has been that all property must be assessed upon the same percentage of its value." *Id.* at 593-95.

Cases interpreting the meaning of Part II, Article 6 have been clear and consistent. In Article 6, "the doctrine of the equality of taxation is affirmed, and measures are provided by which it may be ensured." *State v. Express Co.*, 60 N.H. at 236. "The principle of just equality is therefore the governing one by which the validity of every tax levied by the legislature is to be determined. This equality can be secured only by uniformity in levying the tax, and a periodical valuation of the estates of every citizen." *Id.* at 237 (quotation omitted). "Article 6 . . . was intended to secure proportional assessments by requiring frequent revaluations." *Thompson v. Kidder*, 74 N.H. 89, 95 (1906).

While Part II, Article 5 restricts the legislature's authority to raise revenue through taxation to taxes which are proportional and reasonable, Article 6 regulates that authority by requiring that such taxes be laid according to a valuation on all estates made, at least, within the past five years. Article 6 is an explicit limitation upon the general terms contained in Article 5 and therefore, "it must be construed to control the general terms, for otherwise it will be merely idle and nugatory." *Opinion*, 4 N.H. at 567.

The majority suggests that the statutory mechanism in place for annual assessments "surpasses" the requirement of Part II, Article 6. The State argued at trial that the combination of the current system of annual assessment and equalization is sufficient to satisfy the constitutional requirement of periodic valuation. We disagree with both of these propositions.

First, evidence at trial showed the stark differences among communities in the methods used to establish values within each town. These methods range from full revaluations and physical inspections to annual "pick-ups," or updates, which take the previous year's assessment and add or subtract value based on the information reported by property owners. "Equality in the burden of taxation cannot exist without uniformity in the mode of assessment as well as in the rate of taxation." *Bemis &c. Bag Co. v. Claremont*, 98 N.H. at 450. Every taxpayer must have his property valued for taxation by the same standard as every other taxpayer. *See id.*

Second, the evidence presented was unequivocal that equalization is only intended to adjust property values of a community as a whole, never values between individual taxpayers as is required by the constitution. The only way to achieve equity between individual property owners is to revalue each individual property. This is the principle recognized in Part II, Article 6. While equalization and local annual updating are methods which may maintain current property values for short periods of time, they fall short of satisfying the requirement of taking anew the valuations of the estates. Furthermore, evidence at trial underscored flaws in the current equalization system that raise serious doubt regarding the system's ability to achieve proportionality and equality in the assessment of property taxes in a statewide system.

There are 259 cities, towns and municipalities (municipalities) in New Hampshire, of which twenty-six are "unincorporated areas," which have little, if any, taxable property and are, therefore, not considered in statewide calculations. Evidence at trial established that of the remaining 233 municipalities, seventy-one have not completed *any* reassessment work, including full revaluations, partial revaluations or updates, since at least 1993. According to DRA figures, these towns comprise approximately *$18 billion*, or *over twenty-seven percent* of New Hampshire's $67 billion total equalized property value.

In addition, 184 municipalities have not completed a full revaluation of taxable property since at least 1995. In fact, ninety-one, representing over thirty-six percent of the State's total equalized

property value, have not fully revalued their property in over a decade. DRA figures show that these 184 municipalities represent more than *$54 billion*, or *over eighty percent* of the State's total equalized property value. Among those municipalities, Manchester, listed by the DRA as having a total equalized value of approximately $3.9 billion, last revalued its property in 1991; Salem, listed as having a total equalized value of $2 billion, last revalued its property in 1980; and Keene, listed as having a total equalized value of $1 billion, last revalued its property in *1971*. From these figures, it is difficult to comprehend the conclusion reached by the majority that "the evidence was insufficient to show a systematic pattern of disproportionate taxation." We are at a loss as to why these plaintiffs should be required to present any additional evidence in order to meet their burden.

The majority suggests that despite not having revalued its property in thirty years, the process used in Keene results in assessments that are within an acceptable range of market value. We believe that evidence at trial showed a different picture of the state of affairs in Keene. In 1999, the City of Keene hired a real estate appraisal and consulting service to review its valuation system. In an extensive report submitted to the City, the consulting firm noted that "approximately 16% of all the residential property assessments in the City . . . are likely missing significant taxable value. By any professional appraisal standard this is unacceptable. In terms of assessment equity, this simply means that some property owners are not paying their fair share of the City's property wealth." *See Rollins v. Dover*, 93 N.H. 448, 450 (1945) ("As any one's payment of less than his share leaves more than their shares to be paid by his neighbors, his non-payment of his full share is a violation of their constitutional right."). The report further states:

> The City has not completed a citywide inspection of properties since the last revaluation in 1971. By any standard, 28 years since that last citywide inspection program far exceeds professional standards of practice. The City does not have complete and accurate information on all properties thereby foregoing a substantial amount of taxable assessed value. The net result is that the City's tax rate is likely higher than it should be due to property inventory that is missing or listed incorrectly.

> The fact that the City is able to maintain values close to market value is a tribute to the labor-intensive efforts of

the Assessor's staff to continually refine the valuation factoring program. *However, this effort does not address the assessment equity problem that clearly exists due to the incomplete property inventory.*

(Emphasis added.) Common sense dictates that similar conclusions may be drawn regarding the 183 additional municipalities that have not fully revalued their taxable property in at least seven years.

The plaintiffs' expert testified at trial why periodic revaluation of property is critical.

> The problem is that the characteristics and conditions that affect property are constantly changing. Change is one of the principles of appraisal. There is [sic] physical changes to property, garages are enclosed into living area, or carports are enclosed, people make additions . . . swimming pools and so forth, and then there's also external changes to property, streets change, neighborhoods change, different — external factors that affect the property; a new park go [sic] in, can have a commercial encroachment going on and so forth. So as a way of updating the characteristics of the improvement or improvements and the surrounding factors that affect property, the data has to be updated periodically. As I said, the longer you let it go, the more problems that are going to arise in the data.

There is no fair standard under which one could conclude that the failure to fully update values of over eighty percent of the total equalized property value in the State can serve as the foundation for proportional and reasonable taxes. Even limiting the analysis to the seventy-one municipalities that have not completed any reassessments since 1993, we would find the fact that approximately thirty percent of this State's municipalities have failed to perform any reassessment work on property representing over twenty-seven percent of the taxable equalized property value in the State shows a "systematic pattern of disproportionate taxation."

Because the statewide property tax scheme as currently applied lacks uniformity in the methods by which municipalities assess the value of taxable property and bases the determination of taxable amounts on property that has not been revalued within a five-year period, we would affirm the trial court's conclusion that the scheme violates Part II, Article 6 of the New Hampshire Constitution.

We note that despite our conclusion that the statewide property tax, as applied, is unconstitutional under both Part II, Article 5 and

Part II, Article 6 of the State Constitution, we would not immediately enjoin the State from collecting taxes under this statute. Indeed, we would agree with the majority and allow the State until the current statute expires in January 2003 to redraft the statute and address its constitutional infirmities.

## IV. Remedy

Because we would find the property tax unconstitutional, we would remand the case to the trial court for a determination of an appropriate remedy. The trial court ordered the State to refund $880 million, the amount collected under the statewide property tax in tax years 1999 and 2000, as the appropriate remedy for the constitutional violations. The basis for the court's order was that "[t]he State agreed, by objecting to the request for interpleader of the tax funds, that if the tax was declared unconstitutional or otherwise invalid, they would repay all of the taxes already collected." While reimbursement is not a remedy we would have recommended, based on representations made by the State, it is understandable why the trial court found that the State had "repeatedly and unequivocally reminded the Court that if the statewide property tax were declared unconstitutional it would be solely the State's obligation to fully refund, credit or otherwise remedy *all* taxpayers who had made payments under this tax."

The plaintiffs initially requested class certification. In objecting to this motion, the State represented that a class action was unnecessary because "the State has adequate funds to repay any of the Tax that is collected if the Tax is declared unconstitutional." Upon the plaintiffs' withdrawal of the class certification request, the trial court issued an order stating: "A request for class certification was filed by the plaintiffs, and *as a result of* the State's stipulation that if the statute is declared unconstitutional the money will be returned, the request for class certification has been withdrawn." (Emphasis added.) The State never asked for reconsideration, clarification, or otherwise objected to this order.

Subsequently, seventeen "donor" communities filed a bill to interplead their excess property tax payments in escrow pending the outcome of the *Sirrell* plaintiffs' lawsuit. The State objected and at a hearing argued that

> [i]f the tax is collected and it's determined to be unconstitutional, it's the State who's responsible to the taxpayers in the State, to refund or to credit or to somehow remedy that situation. . . . The result is that if there are no funds in the

education trust fund and the Supreme Court declares this tax unconstitutional and orders the State to refund $18.3 million in specific, and a total of $440 million, then the State will be responsible to do that out of the general fund. That will be the State's responsibility.

In its order denying the bill of interpleader, the trial court stated, "The State has taken the position that, if the tax is declared unconstitutional or otherwise invalid, they will repay all of the taxes collected, both to the 'donor' communities and to the 'receiver' communities." The State neither objected to this order nor sought reconsideration or clarification.

Finally, at trial, the State's opening statement included the following:

This is really a $440 million dollar issue, because if the Court determines that the statewide property tax is uncon-stitutional, it's not just the $24 million dollars that has to be credited, refunded or offset, it's the $440 million dollars, because that whole tax was collected to fund adequacy even though some portions remained in the communities. It is the whole tax that was collected under the statewide education property tax, and by December 1st it will be two years that the tax is collected, which will be a total of $880 million dollars at this point.

We find it disturbing that the State made explicit representations to the trial court, upon which it and the plaintiffs obviously relied, and now the State contends on appeal that the trial court's reliance is reversible error because "none of the State's arguments consti-tute an agreement or a stipulation to repay any amount" and because "the State does not have statutory authority to agree to repayment of $880 million, or to the repayment of the 'excess property taxes' amount." The State should have considered whether it had such authority *before* making representations to the trial court. At the very least, the State should have promptly alerted the court, upon the issuance of each of its orders in which it was clear that the court interpreted its statements as an agreement to pay or reimburse the entire statewide property tax, that the State did not mean what it said.

Regardless of whether the State had the authority to make the statements that it did, however, we would agree that it would be inequitable in this case to require the repayment of nearly one billion dollars to taxpayers in this State, money which has been

spent on the provision of public education. *See Opinion of the Justices*, 131 N.H. 644, 650 (1989). In fact, the plaintiffs acknowledge that they "never requested, and are not now requesting, reimbursement of the nearly one billion dollars collected under the statewide property tax. The Plaintiffs recognize that such relief would cripple the State [and that] to require the State to reimburse the total amount of the statewide property tax would constitute an unfair windfall."

We would remand to the trial court the issue whether any retrospective relief would be appropriate, including whether any of the plaintiffs are entitled to a refund of taxes paid. *See Smith v. NH Dep't of Revenue Admin.*, 141 N.H. 681, 696-97 (1997). The plaintiffs would have the burden of proving harm and establishing that procedural requirements for relief had been met. *See generally* RSA ch. 21-J (2000) (setting forth statutory procedure for obtaining tax refund, including statute of limitations); *Private Truck Council of America v. State*, 128 N.H. 466, 474 (1986) (to recover taxes paid under a common law refund theory plaintiffs must prove that they paid under protest).

## ON THE PLAINTIFFS' MOTION FOR RECONSIDERATION.

After the foregoing opinion was issued the plaintiffs moved for reconsideration. The court upon September 4, 2001, made the following order:

Plaintiffs' motion for reconsideration is denied.

In their motion for reconsideration, the plaintiffs ask the court to remand the case to superior court for a new trial. They argue that: (1) they failed to offer proof that the education property tax resulted in harm because they anticipated that it would be relevant only to the "remedy" phase of the litigation; and (2) this court announced a standard of proof that was much higher than the one they urged and expected. We find these arguments unpersuasive and address each in turn.

This litigation was bifurcated into a "liability" and a "remedy" stage. At the liability stage, the plaintiffs were required to show that the taxing scheme was unconstitutional as applied. At the remedy stage, they would have been required to show that the taxing scheme resulted in monetary damages. The plaintiffs and the dissenting justices have mistakenly conflated the two stages and the burdens of proof associated with each.

At the liability stage, the plaintiffs had to show that the taxing scheme, as applied, resulted in disproportionate taxation. *See*

*Delude v. Town of Amherst*, 137 N.H. 361, 363 (1993); *Austin v. State Tax Comm'n*, 114 N.H. 137, 139 (1974), *reversed on other grounds*, 420 U.S. 656 (1975). Because the plaintiffs sought to have the entire statewide property taxation scheme declared unconstitutional, they were required to show more than slight or inadvertent disproportion; they had to show a widespread scheme of disproportionate taxation. This is the "harm" to which we referred. Had the plaintiffs proved at the liability stage that the taxing scheme was unconstitutional, then at a subsequent remedy stage, they would have been required to quantify their monetary damages. However, as we stated in the opinion, the plaintiffs failed to show that the taxing scheme was unconstitutional as applied.

The plaintiffs and the dissenting justices have focused upon and misunderstood our use of the phrase "widespread intentional discrimination." By definition, disproportionate taxation means that a taxpayer is taxed at a rate or based upon a percentage of fair market value that is higher than another taxpayer. This is the "discrimination" to which our opinion referred. We noted that to prevail in a declaratory judgment proceeding in which the disparity between taxpayers was slight, the plaintiffs would have to show that it was intentional. The plaintiffs, however, could have satisfied their burden of proof by establishing that the disparity between taxpayers was substantial or that the lack of uniformity was great. *See, e.g., Claremont School Dist. v. Governor*, 142 N.H. 462, 470-71 (1997). Where the disparity between taxpayers is substantial or the lack of uniformity is great, "intentional discrimination" can be inferred. Significantly, however, the plaintiffs failed to prove even isolated or inadvertent lack of uniformity.

Challenges to perceived discriminatory taxation must also rest upon concrete proof, not hypothetical scenarios. As the trial court noted, the plaintiffs failed to prove how the taxation system operated in practice. Rather, they presumed that disproportionate taxation resulted from the system's theoretical flaws. The plaintiffs' presumptions were not proof and did not entitle them to declaratory judgment. *See Delude*, 137 N.H. at 363.

While this standard of proof may have been different from the one the plaintiffs urged and expected, it is the standard of proof that the defendants advocated. *See Leto v. Assessors of Wilmington*, 202 N.E.2d 922 (Mass. 1964). The court imposed no impenetrable barrier, but recognized a bearable burden. *Cf. Marriott Corp. v. Bd. of County Com'rs*, 972 P.2d 793, 797-99 (Kan. Ct. App. 1999). Remand is not required because the plaintiffs failed to meet this burden. *See Lujan v. National Wildlife Federation*, 497 U.S. 871,

897 (1990) ("[A] litigant's failure to buttress its own position because of confidence in the strength of that position is always indulged at the litigant's own risk").

We therefore decline the plaintiffs' request to remand this case for a new trial. The plaintiffs have already had the opportunity to prove that the system resulted in disproportionate taxation and they failed to do so.

NADEAU, DALIANIS and DUGGAN, JJ., concurred; BROCK, C.J., and BRODERICK, J., dissented.

BROCK, C.J., and BRODERICK, J., dissenting. "Whenever this court has been able to ascertain from briefs or oral arguments that a remand is necessary to complete the record or to prevent injustice, the case has been continued in this court and the remand has been allowed." *Rautenberg v. Munnis*, 107 N.H. 446, 448 (1966). Because these considerations are pertinent to this case, we would grant the motion for reconsideration and remand to the trial court.

The record supports that the parties agreed the issues of the constitutionality of the statewide property tax statute and the appropriate remedy in the event the tax was struck down would be tried separately. As pointed out in our dissent in the opinion on this matter, these issues carry different burdens of proof and the question of the harm suffered by the operation of the property tax is relevant to the issue of remedy. At trial on the constitutionality of the statute, the trial court applied existing law, listened to evidence for six days, and issued a sound and persuasive sixty-page ruling in favor of the plaintiffs. On appeal, this court adopted a new, higher burden of proof to which constitutional challenges to taxing schemes are to be held and ruled that the plaintiffs failed to meet that burden. Although we believe that this higher burden was met at trial, "[t]his determination is properly committed to the trial court in the first instance." *Hayes v. Newspapers of N.H.*, 141 N.H. 464, 466 (1996). The trial court and the plaintiffs ought not be penalized for failing to apply a burden of proof not yet in existence in New Hampshire law. *See New Hampshire Supply Co. v. Steinberg*, 119 N.H. 223, 231 (1979) ("The trial court understandably, did not apply the rule of law we enunciate today . . . . We, therefore, remand the case to the trial court to determine . . . whether [the new legal standard is met].").

The majority and the dissent agree that the statewide property tax system is seriously flawed. Given the significance of this case to every taxpayer in the State of New Hampshire, to prevent injustice this court should remand to allow the plaintiffs an opportunity to

satisfy the new burden of proof adopted by the majority on appeal. *See Shannon v. Foster*, 115 N.H. 405, 407 (1975).